## THOMAS H. BEDELL v. JULIUS BERKEY.

*Negligence—Manner of ingress to and egress from premises—Contributory negligence—Evidence—Jury viewing premises.*

1. A stranger who comes on business or otherwise to another's premises has no right to choose for himself his means of ingress and egress, and has no right to determine where bulky articles shall be unloaded, or to unload them without inquiry and notice.

2. There are always places in factories which, whether generally safe or not, are liable to be unsafe at times for any one who is not acquainted with them; and all persons who stray about other people's premises at their own will must look out for their own safety in *such* places.

3. No one has any right to endanger himself, or to disturb other people's arrangements, by moving around in the dark in a strange room, into which he has entered of his own accord and without direction; and if injured, he is responsible for his own misfortune.

4. Testimony of localities can generally be better understood by views and observation than by word of mouth, and changes can just as well be explained in the one case as in the other.

So *held*, in a negligence case where the jury were not permitted to view the premises, photographs of which were offered in evidence and excluded.

Error to superior court of Grand Rapids. (Burlingame, J.) Argued June 27, 1889. Decided October 11, 1889.

Negligence case. Defendant brings error. Reversed. The facts, and points of counsel *passed* upon by the Court, are stated in the opinion.

*Butterfield & Keeney,* for appellant.

*J. C. Fitz Gerald* (*F. A. Stace* and *Charles Chandler,* of counsel), for plaintiff.

CAMPBELL, J. On March 21, 1887, at about 4 o'clock in the afternoon, plaintiff fell down an elevator shaft from the ground floor to the bottom, in a building partly occupied by defendant for making wooden tripods. The declaration relies as grounds for the charge of negligence on the alleged failure to have the elevator shaft guarded in any way, and the darkness of the room upon which it opened. Plaintiff was averred to have been unacquainted with the premises, and to have been there for the lawful purpose of transacting business, at defendant's request, and to have been exercising due care.

The defendant's testimony indicated that the elevator had proper doors, and was not left open or unguarded. It also indicated that the room was not without sufficient light, and that plaintiff had no business where he was, and exercised no caution, but was hurt by his own heedlessness or fault. It was claimed on the trial that plaintiff's own testimony made out no cause of action, and, as this question lies at the threshold of the case, it requires attention.

The plaintiff's statement is, in substance, that he had held some interviews with defendant concerning the business of making and finishing tripods. The building in which the work was done had been partly occupied for defendant's work, and partly by a company making felt goods, who had recently

quit work there, and removed most of their stuff. . This building fronted westward on Canal street, in Grand Rapids, and at the east end of the building was an alley in the rear. There was a basement, mostly under ground, and defendant occupied a part of the first floor above the basement, and part of the upper stories, including the fourth. A driveway passed along the south side of the building from Canal street to the alley. The alley was not open beyond the north side of the building. The business office was on the ground floor on the Canal-street front. On the alley in the rear this floor was reached by a platform about 4 feet above the ground, with an open front to let light into the basement. This floor was divided by east and west walls into three sections, each 25 feet wide. Each of these sections had a door, and a window on each side of it, opening over the rear platform, the windows being 4x9 feet, and the doors double, each leaf being 2½x8½ feet. The elevator in question was in the wall between the middle and north sections, opening on each, being about 9 feet from the rear of the building, and in size about 7 feet 2 inches by 5 feet 7 inches, thus projecting into each section about 3 feet 7 inches. It had double doors on each side, but there was a dispute whether those on the middle section side were in place. The shaft was lighted by a window reaching across the projection into the middle section. The doors opening on the rear platform each had two lights of 20x31 inches, and two transom lights above them of 27x28 inches. At the time of the accident the elevator in the middle section opened into a small room partitioned off by boards, and called a "storm-room," designed to keep the cold air from the rest of the section when the rear door was opened. This storm partition included the rear door and north window of the middle section up to the transom, and ran to the west side of the elevator, where a sliding door gave access from the storm-room to the rest of that section.

In one or more instances plaintiff had gone up in the ele-

vator, entering it from the north side. His declaration claims that he never was in the room on which it opened on the other side, and so he swears. The explanation he gives of entering it on the occasion in question is this: While in the office, talking with defendant about the sanding and finishing of the rods or poles of which the tripods were made, plaintiff told Mr. Berkey that he knew of a machine formerly used by the Bissell Carpet Sweeper Company, which he thought would do the work faster. Defendant, as plaintiff swears, asked plaintiff if he could get the machine, and plaintiff said he thought he could. Defendant asked him if he could get a team and go and get the machine for him, and he said he would, and did so. The machine was about 7 feet long and 5 feet wide, called a "sander."

Plaintiff states, further, that he had the sander taken by a team, and that the teamster took it in by the side passage into the alley, and opposite the north door; that plaintiff, coming a little while after, went by the same way, and tried to open the north door, but found it fastened. He then went to the middle door, and opened it, and when he closed it he found himself in what he calls a darkish room, not altogether dark. He says:

"I saw a little light shining through here, ahead of me, just a dim light, and I walked up here, saw this light, took it to be an opening between the door, between the two sections, the middle and the north sections. I turned to my right, and, as I supposed, was going through into this department through a door, and I stepped into a hole."

After he fell in he looked up and saw the elevator was standing at the third floor above.

Plaintiff was allowed, against objection, to show that a few weeks after the accident he went into this same storm-room, and to describe various things he then found which obstructed the light, and which he claimed were there when he was hurt. It appears, however, from his minute description, that he

had no trouble in seeing and describing the construction and contents of the room, and all its means of ingress and egress. There was nothing to cut off the light from the outer door, although some rods were so piled as to be across part of the window. The testimony is full to the point that it was used as a packing and marking room for shipment of parcels.

Taking plaintiff's own testimony as a correct version of the disputed facts, he had not ascertained and did not promise to a certainty that the sander could be obtained at all, or when it would be obtained, or when it could or would be brought if so obtained, or where it would be wanted or placed. He gave no notice to defendant to be ready to receive it, and gave no notice of its arrival when it came. He had never been informed that there was, and there was not in fact, any door of communication between the north and middle sections in that part of the building; and he had no reason for assuming that the north section was the proper place to put the machine, or that the door of that section was the proper place to receive it. From his account of his visits to the place to confer with defendant, it is apparent that he was very heedless and unobserving of his surroundings, and knew very little more of them than if he had never seen them. He did know where the office was, and had when visiting the building entered it by the front and not by the rear.

It is no more than plain common sense, that a stranger who comes on business or otherwise has no right to choose for himself his means of ingress and egress, and has no right to determine where bulky articles shall be unloaded, or to unload them without inquiry and notice. It was plaintiff's business to go to the office and find out what was to be done with the machine, as well as to enable defendant to take his own measures and use his own men to unload and place it. According to his own story, he knew nothing about the uses or condition of the rear part of the middle section. It had never been brought to his attention as a place where he could

properly enter the building, and defendant owed him no duty on the subject. There are always places in factories which, whether generally safe or not, are liable to be unsafe at times for any one who is not acquainted with them; and all persons who stray about other people's premises at their own will must look out for their own safety in such places.

As the time when plaintiff went into the storm-room was at least about two hours before sunset, and the room, which was a very small one, had lights which, whether clean or dirty, occupied a large share of the rear end, and he subsequently found them to give light enough to see all that was important to be seen, and as he says that on this occasion he saw the lights in the elevator shaft immediately after entering the door, when it was, as he says, some seven feet away, it was his business if he found it obscure to wait until his eyes got accustomed to the light before moving round at haphazard, without using any care whatever to know where he was going. No one has any right to endanger himself, or to disturb other people's arrangements, by moving round in the dark—if it is dark—in a strange room, into which he has entered of his own accord and without direction. If, instead of hurting himself, he had injured or destroyed some fragile and valuable article left there, he would have found no reasonable excuse for his trespass. He is in no better position because he was seriously hurt than if he had hurt somebody or something else. He is himself responsible for his own misfortune, and made out no case for redress.

As we can see no ground on which plaintiff could recover in any event, we do not think it worth while to discuss the other errors alleged. There was no good reason, that we can see, why the jury should not have seen the premises, or why the photographs should have been excluded, that should not have equally shut out a large portion of plaintiff's testimony of conditions not contemporaneous. Testimony of localities

can generally be better understood by views and observation than by word of mouth, and changes can just as well be explained in the one case as in the other. The court also refused some requests concerning reciprocal rights and duties, and the effect of plaintiff's negligence, which should have been given. In actions for personal injuries, juries require very pointed and well-defined instructions to keep them from acting on vague ideas. There was also some hearsay testimony improperly admitted. And the medical testimony was more than usually hypothetical. But as we think the case should not have been left to the jury, there would be no profit in discussing these questions.

Judgment should be reversed, with costs of both courts.

The other Justices concurred.