MURPHY *v.* GRAND RAPIDS VENEER WORKS.

1. MASTER AND SERVANT — SAFE PLACE TO WORK — ELEVATOR SHAFTS.

Act No. 113, Pub. Acts 1901, requiring in section 5 that hoisting shafts and well holes in manufacturing establishments be properly closed and secured, imposes a duty on manufacturers to protect their employés from the danger of falling down elevator shafts from the inside, and not merely a duty to prevent people from accidentally falling down an elevator shaft from the outside.

2. SAME—ASSUMPTION OF RISK—VIOLATION OF STATUTE.

A servant does not assume the risk due to an omission by the master of a statutory duty imposed on him for the protection of the servant. *Sipes* v. *Michigan Starch Co.*, 137 Mich. 258, followed.

3. SAME—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY.

In an action for the death of a servant caused by his falling down an elevator shaft while moving a truck onto the elevator, whether the servant was guilty of contributory negligence, *held,* under the evidence, a question for the jury.

---

[1] See *Toney* v. *Knapp*, ante, 652.—REPORTER.

Error to superior court of Grand Rapids; Newnham, J. Submitted June 22, 1905. (Docket No. 46.) Decided January 24, 1906.

Case by Maggie Murphy against the Grand Rapids Veneer Works for the negligent killing of plaintiff's intestate. There was judgment for defendant on a verdict directed by the court, and plaintiff brings error. Reversed.

*R. M. Ferguson* (*Taggart & Taggart* and *McKnight & McAllister*, of counsel), for appellant.

*Bundy, Travis & Merrick*, for appellee.

McALVAY, J. Defendant owned and operated a veneer manufactory in the city of Grand Rapids. In the four-story building known as " Mill No. 1," in which this business was conducted, was an elevator used in connection with the business, located in a brick shaft outside and on the south side of the factory. The south wall of this shaft is built thicker at the base than at the top. The elevator platform is 14 feet in length north and south, and 7 feet in width east and west. At the first floor this platform fills the entire shaft. At the third floor, on account of the wall being not so thick, there is a space between the south end of the platform and the south wall 14 inches wide by 7 feet long. Thirty-three inches above the platform of the elevator when at this floor, there is fastened, as a stay upon the top of the sides of a sliding door frame which project up from the story below, a board 4 feet 9 inches long, and 3¾ to 5 inches wide. It extends east and west, and its south edge is 8 inches north from this south wall. This sliding door closes an opening in the south wall of the elevator shaft in the story below. The shaft was well lighted. The elevator platform was smooth, matched flooring.

Plaintiff's decedent had worked for defendant company three months. He had charge of and operated this ele-

vator for about six weeks, and, with another man, during this time, worked in taking stock up and down the elevator from one floor to another to and from the dry kilns. A truck was used to carry the material. It was 17 inches high, and upon the top or body, which was 61 inches long by 39 inches wide, were laid two boards about 10 feet in length and 9 inches wide, placed two feet apart. Plaintiff's decedent was within a few days of 20 years old, weighed 140 pounds, and was of slender build. He was a steady and ordinarily intelligent workman. On April 20, 1903, while engaged in this work with the elevator at the third floor, the accident occurred. The elevator was locked, and this young man was starting to go down after another load of stock, and was drawing the truck onto the elevator with his back towards it. He whistled to his partner to go down with him. He was stooping over with his hands holding the boards on the truck, pulling it. He was backing slowly and carefully. He suddenly disappeared, falling through this opening on the south side of the shaft about 50 feet to the bottom. He died in a few hours from the injuries received from the fall. Nobody saw exactly how the accident occurred. The witness Post, who was coming toward the elevator, was looking directly at him, and was the only one who saw him at the time he fell, and, after describing what decedent was doing and locating him about two feet from the opening, he testified:

" He seemed, as near as I noticed as he was getting toward the back of the elevator, as though he was shortening his steps, more kind of sliding his feet along, instead of walking back as he started. I saw him start to fall; that is, I saw him disappear."

This witness had come from Mill No. 2 upon the bridge connecting it with No. 1, and at the time was about 10 feet away from the elevator. Another witness, Frank Leslie, who was on this third floor at the time of the accident, described the elevator and this opening. He said that the opening through which Murphy fell was of no use or benefit in carrying on the business; that it was the

custom to either push or pull the truck onto the elevator, just as happened to be most convenient, according to where the person stood who was doing it. At this time witness was standing 10 or 12 feet away from the elevator. He saw Murphy pulling the truck onto the elevator. He says Murphy whistled for his partner, Smith, who was about 60 feet away; that he took hold of the ends of the boards on the truck which were 8 or 10 feet from the elevator, and pulled it on; that the elevator was locked at the time of the accident. He said:

"Mr. Murphy was about two feet from the opening through which he fell when I last saw him, and was pulling the truck on the elevator very moderately. He was a cool, deliberate worker. * * * I heard him whistle, and I turned to his partner and whistled to call his attention, * * * turned my head, whistled, and turned my head back again, not more than 15 or 20 seconds. He was gone. I heard no cry from him or any one."

As to the construction and dimensions of this elevator shaft and platform, and the size and location of this opening through which Murphy fell, there is no dispute. At the close of plaintiff's case, defendant by its counsel requested that the court direct a verdict for defendant, on the ground that deceased, as appeared from the evidence, had assumed the risk of his employment, and was guilty of contributory negligence. Such verdict was accordingly directed, upon the ground that Murphy had assumed the risk of the employment.

In determining the question as to whether the doctrine of the assumption of the risk by the servant is to be applied in this case, we must first consider whether or not a statutory duty, under section 5 of Act No. 113 of the Public Acts of 1901, was imposed upon defendant, a neglect of which duty resulted in the injury to plaintiff's decedent. That part of section 5 of this act which is claimed to impose this duty provides:

"Sec. 5. It shall be the duty of the owner, agent, or lessee of any manufacturing establishment where hoist-

ing shafts or well holes are used, to cause the same to be properly inclosed and secured."

The other provisions of the section relate to the requirement of automatic doors or gates at all elevator openings, and for the annual inspection by State officers of elevator apparatus. The contention of defendant is that this statutory duty imposed was clearly for the purpose of preventing people from accidentally falling in from the outside. May it not be said that the legislature considered the safety of employés whose duty brought them continually in contact with these dangerous places on the inside as well as on the outside of elevators? That the legislative intent was to protect everybody who might be in danger of injury? If the construction insisted upon by the defendant is given, then this elevator shaft built outside the building with doors opening into it from the different floors was properly inclosed and secured, and no further duty was imposed upon defendant. No argument is necessary to show that an opening 14 inches wide and 7 feet long between the edge of an elevator platform and the wall of the shaft, if not inclosed, is an unsafe and dangerous place to every person who goes up or down on that elevator. If the statute requires only such inclosure and security as will prevent people from the outside from falling in, then this space between the platform and the wall might be of any dimensions. In the case at bar it may be well said that this shaft on the south side was never inclosed and secured. This space was left by building a lighter wall for the upper stories. It was of no use or necessity for the conduct of business. But whether a shaft is built within or without a manufactory, our construction of the statute is that it required such shaft to be properly inclosed and secured to protect all who had occasion to use it, and that in this case that statutory duty had not been performed by defendant.

This court has held that the assumption of risk by the servant arises from the contract of employment, and the

doctrine cannot be applied where a statutory duty has been neglected, for the reason that a master cannot legally contract to violate a statute. *Sipes* v. *Starch Co.*, 137 Mich. 258, citing *Narramore* v. *Railway Co.*, 37 C. C. A. 500 (48 L. R. A. 68). Upon this question these cases rule the case at bar. The court took the case from the jury upon this question, and was in error.

It is urged that the plaintiff was guilty of contributory negligence, and could not recover in any event. As this question will be raised again upon a new trial, it is given consideration. Whether Murphy's feet slipped upon the smooth floor of the platform, or whether in his stooped position he bumped against the board fastened to the top of the sliding door frame and his feet slipped back, or exactly how the accident occurred, does not appear. No evidence was introduced by defendant, and, from the evidence in this record of the acts of Murphy immediately preceding the accident, we cannot determine as a question of law that he was guilty of contributory negligence. There was sufficient evidence in the case to warrant the submission of that question to the jury.

The judgment of the superior court is reversed, and a new trial ordered.

BLAIR, MONTGOMERY, OSTRANDER, and HOOKER, JJ., concurred.