NOACK *v.* WILLIAMS, DAVIS, BROOKS & HINCHMAN SONS.

1. LANDLORD AND TENANT—LIABILITY FOR PERSONAL INJURIES—
   STATUTES—AUTOMATIC GATES — ELEVATORS—NEGLIGENCE—WHO
   IS TENANT.
   Act No. 285, Pub. Acts 1909 (2 How. Stat. [2d Ed.] § 4020),
   requiring the owner, agent or lessee to provide automatic
   gates at elevator openings in manufacturing establish-
   ments, workshops, hotels or stores, applies to a lessee

from a tenant, after the expiration of the term of such sublessee who obtains oral permission for a valuable consideration to hold over for a stated period in order to remove his property.[1]

2. NEGLIGENCE—ELEVATORS—PERSONAL INJURIES—GATES.

The question of contributory negligence of plaintiff's decedent in falling down an unguarded elevator shaft, which he did not know was unprotected, having received no warning of any violation of statute, was a proper one for the jury.

Error to Wayne; Hally, J. Submitted January 9, 1913. (Docket No. 2.) Decided April 8, 1913.

Case by Martha Noack, administratrix of the estate of Carl Noack, deceased, against Williams, Davis, Brooks & Hinchman Sons, a corporation, for personal injuries. Judgment for plaintiff. Defendant brings error. Affirmed.

*Keena, Lightner, Oxtoby & Oxtoby*, for appellant.

*Dohany & Dohany*, for appellee.

STONE, J. This suit was brought to this court by writ of error, to review a judgment entered in the circuit court for the plaintiff for $3,000. Plaintiff's intestate, Carl Noack, aged 49 years, was instantly killed January 2, 1911, in the elevator shaft of the Jeffers building at Saginaw. The building belonged to Elizabeth Champ, legatee of Michael Jeffers, deceased, and was first leased by Michael Jeffers to the Smart & Fox Company on February 29, 1904, for the term of ten years from and after November 1, 1905. The interest came to Miss Champ later, and the lease was formally assigned to her by the administrator

[1] The question of the liability of the owner for injury to tenant's guests or employees by defect in premises is treated in a note in 17 L. R. A. (N. S.) 1161. And as to the liability of a landlord for injury to tenants from defects in premises, see note in 34 L. R. A. (N. S.) 798.

of the estate of Michael Jeffers, deceased, March 8, 1906.

The premises were sublet by the Smart & Fox Company (Lee, Cady and Smart, owners) to the defendant, sometimes known as the Michigan Drug Company, and operating in Saginaw as the Saginaw Valley Drug Company. Miss Champ testified that she did not recognize any one except the Smart & Fox Company as tenants, yet she knew of the occupancy of the defendant when it went in, and was consulted about it. The defendant had been in possession four or five years. It is conceded that for the purposes of this record the Saginaw Valley Drug Company, the Michigan Drug Company, and Williams, Davis, Brooks & Hinchman Sons are identical; and Lee & Cady and the Smart & Fox Company are identical.

In the fall of 1910 or earlier, the defendant had leased new quarters in Saginaw, and had agreed to vacate the Jeffers-Champ store by January 1, 1911. Defendant started to take its goods out in December; but, having some trouble getting into its new building, it could not vacate the old store at the time it had agreed to, and it applied to the Smart & Fox Company (Lee & Cady) for permission to hold over for a limited number of days, either eight or nine, which was granted, and a lump sum was agreed upon and paid by defendant for the privilege. It appears that by January 6, 1911, Lee & Cady, under the name of the Smart & Fox Company, went into possession of the building in question. On January 2, 1911, defendant still had in the old store and on the dock some carboys of acid and other goods, and there were some fixtures in the building to be removed.

Plaintiff's intestate was an employee of one Michael Mutschler, a carpenter contractor, who had been employed by defendant to take down in the old store, and remove to and put up in the new store, some of

the shelving, show cases, a dummy elevator, etc. Plaintiff's intestate was employed by Mutschler to assist in this work. At the rear of the store was a broad ledge, which, with the building itself, formed the loading platform. Double doors on the alley guarded the elevator on the left and the passageway alongside the elevator leading to the first floor of the building. The elevator landing was above the level of the alley and on a level with the platform of an ordinary wagon; the height of the ledge being 3½ or 4 feet, and the width of the ledge being 23 inches. There was an automatic gate on the elevator shaft, at the landing, on the inside of the store, but no automatic gates on the alley side, or outside of the elevator; instead, however, there were solid wooden doors on rollers, and by the undisputed evidence such doors were rolled away, thus leaving an opening and no protection at the time of the injury complained of, upon the alley or outside of said shaft, and the elevator was in the upper part of the building at that time. The alley, so called, was a covered driveway on the west side of the building, was 25 or 30 feet wide, open at both ends, and having windows on the outside. It was not dark in the daytime in the alley, and teams and other objects could be plainly seen there. The outside doors were 4 feet wide and of the same width as the elevator shaft. The barrier on the left of the elevator (looking west) was 3½ or 4 feet high, and one could look over this barrier and see whether the elevator was up or down. Approaching the building or the elevator shaft from the alley, one would have to climb up 3½ or 4 feet to get into the building, and could go across the elevator, if it was there, or through a passageway at the right of the elevator. One approaching the alley from the store, going west, could go across the elevator if it was there, or go along the passageway to the' left of the elevator.

The accident or injury happened about 1:30 o'clock in the afternoon. The principal conflict or disagreement in the testimony is as to the extent of decedent's acquaintance with the location, and its surroundings.

Plaintiff's witness Joseph Neuman testified that he and decedent were working on the first floor trying to pry a show case away from the wall; that they could not get it away with the tools they had and thought it better to get something to pry with. Neuman suggested to decedent that he go out and get a couple of pieces of board, whatever he could find, to pry with. Witness knew there were some boards in the alley because he had been out there before, and decedent knew it. There were three ways in which decedent could have gone to the alley for these boards; he could have gone out another door entirely (a door farther to the south), which was just as near as the door in question, or he could have gone to the left-hand side of the elevator and jumped down into the alley, or, if the elevator was on the first floor and the elevator gate was up, he could have gone across the elevator platform. Neuman testified that he started for the alley, but he did not follow him to see how or which way he went. Almost immediately after Neuman saw decedent, he (Neuman) learned that there had been an accident, and decedent was down the shaft. Neuman further testified that he and decedent had been working there in that store three or four days; that witness had occasion to pass the elevator 10 or 15 times a day; that decedent had probably passed it the same number of times, and must have known it was there; that if the inside gate was down the elevator would either be at one of the upper floors or down in the basement, and if the elevator was level with the ground floor the gate would not be there; that the gate could be plainly seen by any one with ordinary eyesight, and decedent did have ordi-

nary eyesight, and did not wear glasses; that on the different occasions that the witness Neuman had gone out into the alley, some three or four times, he had jumped out into the alley unless there was a team there, and then he walked out over the wagon and then jumped, or else he went out the other door, which was probably 20 feet to the left; that it would be a man's choice whether he would take one door or the other.

Another witness for the plaintiff, Fred W. Hillman, testified that he was working in this store on the day in question; that his work was to take care of the cellar and furnace. The witness testified that he had not seen decedent the morning he was killed, and did not know the man; that witness had been there every day up to the accident and had not seen decedent, who was not there at all; that at the time of the accident witness was on the first floor, between 50 and 70 feet away from the freight elevator. He describes how he went down into the basement by way of the stairs and found deceased lying there unconscious.

Michael Mutschler, another witness for the plaintiff, testified that he had the contract of moving all this material; that he stared in about the 12th of December to put some shelving for the drug company into the new store, and took the old shelves out of the old store; that he had hired decedent, and decedent was one of the men that worked for him. He also hired Neuman and the other man. He testified that decedent had been working for him on this occasion some two weeks. He further testified that during that time decedent had worked in the new building; that that was where they were doing the work; that he worked in the new building that day when he got hurt. And the witness testified that he, himself, got hurt and went home, and that the superintendent took decedent down to the old building. The following is a part of his cross-examination:

"*Q.* Took him down to the old building?

"*A.* Yes, sir.

"*Q.* Now, then, the 10 or 12 days that he had been working there, how many of those days had he worked at the old building in all, and how many on the new building?

"*A.* He didn't work any at the old, only that day.

"*Q.* The rest of the time he worked, did he, on the new building?

"*A.* Yes.

"*Q.* You are sure about that?

"*A.* Yes.

"*Q.* Did you keep a record of where the men worked?

"*A.* Yes, sir.

"*Q.* That is, you jot down the number of days they work for you?

"*A.* Yes.

"*Q.* But you would not write down where they would work, whether at one building or the other?

"*A.* Well, I can tell that he was working there in the new building all the time.

"*Q.* At the new building?

"*A.* Yes.

"*Q.* But you don't know at what hour of the day he was sent from the new building over to the old building; you were not there?

"*A.* Well, I was down there about 9 o'clock.

"*Q.* Where were you working when you got hurt?

"*A.* I was in the new building.

"*Q.* In the new building or the old one?

"*A.* The new building.

"*Q.* Had you been working in the old building that day?

"*A.* No, there was nobody there only early in the morning.

"*Q.* And did you have to go home?

"*A.* Yes.

"*Q.* What time was it?

"*A.* Eight o'clock in the morning.

"*Q.* Well, why did the superintendent go and get Mr. Noack?

"*A.* Well, he could get—I don't know; he could take any one he wanted to. He had to have two men down there.

"*Q.* Had you been down there?

"*A.* No, sir; I have men working down there, but they were not working there but probably a week. We had that lumber out, the shelving out of the old building, and took it up to the new building, and then we were working there again two weeks or so and worked that lumber all up.

"*Q.* What I am getting at is the day Mr. Noack got killed; was it the first day he ever worked in the old building?

"*A.* In the old building; yes, sir."

The other witness who was present was Walter J. Harris, called by the plaintiff. He was the truckman engaged to move defendant's things from the building in question to the new building, and he had five teams engaged in this work. He testified that he had not seen decedent in the building before the time of the accident. He testified that he was standing on the platform looking out into the alley, watching a team that was just driving away with a load. He testified:

"While the team was loading, Mr. Noack was not there; when the team drove away, Mr. Noack was not there; the elevator went up, and still Mr. Noack did not come."

A little while after the team had driven away, Mr. Harris noticed decedent standing on the window ledge opposite the elevator opening. Decedent seems to have come upon the platform from behind the witness, and turning to the left decedent faced Mr. Harris, and then missing his footing fell to the left sideways, into the elevator shaft, striking a beam seven or eight feet below, and was instantly killed. Witness testified positively that decedent had not climbed up from the alley, but he came in back of the witness. He further testified that any one could see whether the elevator was up or down, and they could see whether the gate was up or down, and one could see the barrier on the left side of the elevator. This,

in substance, is the testimony contained in the record relating to the accident.

The evidence shows that the elevator in question was actually installed for the benefit of the defendant, and that defendant paid an additional rental by reason of the expense of the construction of such elevator, for its use.

Plaintiff's action is based upon section 12 of Act No. 285, Public Acts of 1909, making it the duty of the owner, agent, or lessee to provide, or cause to be provided, at all elevator openings in any manufacturing establishment, workshop, hotel, or store, proper trap or automatic doors or automatic gates so constructed as to open or close by the action of the elevators either ascending or descending. Defendant offered no evidence.

Defendant's claims under its assignments of error are twofold:

(1) That it was neither agent nor lessee of the premises, and therefore. no duty to maintain automatic gates on the alley side of the shaft rested upon it under the statute.

(2) That, aside from the question of its negligence under the statute, plaintiff's intestate was guilty of contributory negligence.

1. Appellant's counsel say that it was practically conceded at the trial that but for the statute there would be no negligence on the part of defendant under the rule as stated in *Moll* v. *Cartage Co.*, 82 Mich. 389 (46 N. W. 777). The submission of the case to the jury was on the theory that the absence of an automatic gate on the side of the shaft was, under the statute, evidence of negligence. Defendant claims that the statute must be strictly construed, and that the statutory duty is one imposed on the owner, agent, or lessee, and at no time was it the owner, agent, or lessee and especially that on the 2d day of January,

1911, it was not even a sublessee, but was simply a subtenant holding over by permission of the lessee.

Since the trial of this case at the circuit, the case of *Barfoot* v. *White Star Line,* 170 Mich. 349 (136 N. W. 437), has been decided by this court. The discussion of the question there involved and the authorities cited by Justice OSTRANDER are enlightening upon this subject, and we shall not specifically review that case more than to say that an examination of the different statutes in the several States will show that sometimes the term "owners or managers" is used, sometimes "owners or occupants," and in other instances "owner or proprietor."

No question is raised in this case that the defendant had not been, during its occupancy, and was not at the time of the injury, rightfully in possession of the premises. The undisputed evidence shows that the defendant had been in possession as subtenant under the lessee, Smart & Fox Company, who were tenants of Jeffers originally, and subsequently of Miss Champ. We understand that a "subtenant" is an undertenant; one who leases all or a part of the rented premises from the original lessee for a term less than that held by the latter. In other words, such subtenant is a tenant of a tenant; as the old books say, "one who held of the mesne lord." The lessee so underleasing may distrain or sue for the rent due on the underlease. *Lee* v. *Payne,* 4 Mich. 106; 18 Am. & Eng. Enc. Law (2d Ed.), p. 658.

The undisputed evidence shows that, on the day of the death of decedent, the defendant was in possession of the premises under an oral arrangement with the lessee, founded upon a sufficient consideration. We fail to see any distinction between a subtenant and a sublessee. An oral lease for ten days is a valid lease, and the tenant is as much a lessee as though he were in under a written lease. The dominion and control which this defendant had over the premises in ques-

tion were as great and complete as had been the case during any portion of its holding. It was the lessee of the lessee, and the relation of landlord and tenant existed between the lessee and the sublessee. We are of opinion therefore that the defendant was a lessee within the meaning of this statute.

As was said by the supreme court of Minnesota, in *Tvedt* v. *Wheeler*, 70 Minn. 161 (72 N. W. 1062), in speaking of a similar statute:

"It is a police regulation founded upon sound public policy, and courts ought not to strain or restrict by construction its language so as to impair its useful operation. It should be construed so as to effectuate the wise and humane purposes of its enactment."

We think the trial judge did not err when he used the following language:

"I think the statute applies to either a lessee or a sublessee, the object being to compel the person who is in charge to provide a safeguard in connection with the labor that is employed in or about the place. Generally speaking, any man in possession and in command and control of a piece of property is a lessee whether he be called a lessee or a tenant. On the termination of the written lease belonging to the defendant, an arrangement was effected between the lessee and the sublessee, the sublessee being the defendant in this case, whereby its possession and control of the property was to continue for a certain additional period of time, the time not being definitely fixed, but a definite amount of money in a lump sum being paid for that tenancy. Under these circumstances, I think the application of the statute rests upon the defendant."

2. Upon the question of claimed contributory negligence of the decedent, the question is a close one. Looking at the entire evidence in the case, we are not prepared to say that the decedent went into or exposed himself to a place of known danger; or that he did not exercise such care as an ordinarily prudent man would have exercised under like circumstances.

There is evidence tending to show that when he stepped upon the platform behind Mr. Harris the latter was looking up the alley watching a load that was passing out, and that decedent's attention seemed to be attracted in the same direction, and that in moving he made a misstep and fell into the elevator well. Had the elevator well been there guarded as required by the statute, it is very evident that the deceased would not have fallen. The absence of the statutory guard was at least the occasion of his fall. It was a question for the jury how long a time the decedent had been in and about the premises, and how well acquainted he was with them. Assuming that he had been there the length of time testified to by Mr. Neuman, at work inside the building, that would not necessarily charge decedent with knowledge of the fact that the westerly side of the elevator was not equipped with an automatic gate, as required by law.

It will be noted that in *Barfoot* v. *White Star Line*, *supra*, the question of contributory negligence, under circumstances somewhat similar, was held properly left to the jury.

In *Preuschoff* v. *Brewing Co.*, 132 Mich. 107 (92 N. W. 945), plaintiff's intestate was killed by falling through a trapdoor, from which the stairway had been removed, upon premises with which plaintiff's intestate was well acquainted. It was held that, even though a fellow employee testified that he had warned deceased of the danger, his contributory negligence was still a question for the jury.

We call attention to the case of *Murphy* v. *Veneer Works*, 142 Mich. 677 (106 N. W. 211). That was an action for the death of a servant caused by his falling down an elevator shaft while moving a truck onto the elevator. The defendant was there charged with violation of a statutory duty. The circumstances are disclosed in the opinion; and it was there held by this court that whether the servant was guilty

of contributory negligence under the evidence was a question for the jury. In that case plaintiff's decedent had worked for the defendant three months, and had operated the elevator there involved for about six weeks.

Plaintiff's counsel have also cited the case of *Guggenheim* v. *Railway Co.*, 66 Mich. 150 (33 N. W. 161), a case where the testimony showed that decedent's attention had been called to an approaching train by which he was killed, and the question was there left to the jury as to his contributory negligence.

In the instant case there is no claim that decedent was warned, and it does not clearly appear that he had reason to believe that defendant had violated the statute in question; and there is much force in the claim of plaintiff that under these circumstances the question of decedent's contributory negligence was one for the jury.

See *Engel* v. *Smith*, 82 Mich. 1 (46 N. W. 21, 21 Am. St. Rep. 549). In that case plaintiff was injured by falling through a trapdoor, with the location of which and its surroundings he was familiar. It was there held that though a question of some difficulty, it not being free from doubt, it was proper that the facts were submitted to the jury.

Appellant's counsel have called our attention to the cases of *Bedell* v. *Berkey*, 76 Mich. 435 (43 N. W. 308, 15 Am. St. Rep. 370) ; *Pelton* v. *Schmidt*, 104 Mich. 345-350 (62 N. W. 552, 53 Am. St. Rep. 462) ; *Hutchins* v. *Sleigh Co.*, 61 Mich. 252 (28 N. W. 85). In *Bedell* v. *Berkey* it appeared that the plaintiff was wandering about in a dark, strange room where he had no business, and it was said that he was wrongfully in the place. We think that this cannot be said of decedent in the instant case as matter of law. In *Pelton* v. *Schmidt* the question of contributory negligence was held to have been properly left to the jury. The *Hutchins Case* is an exceptional one, in which

the writer of this opinion was counsel, and it rests upon its own peculiar facts. We think it clearly distinguishable from the instant case.

Upon the whole record we are of the opinion that the question of decedent's contributory negligence was one for the jury, and that the question was properly submitted to them by the trial judge.

Finding no error in the record, the judgment of the circuit court is affirmed.

STEERE, C. J., and MOORE, McALVAY, BROOKE, KUHN, and BIRD, JJ., concurred with STONE, J.

OSTRANDER, J. I concur on the ground that defendants were the lessees in control of the premises and elevator.