JOHN WRIGHT, APPELLEE AND CROSS-APPELLANT, V. SELDEN-
BRECK CONSTRUCTION COMPANY, APPELLANT; FIRST
NATIONAL BANK OF LINCOLN, APPELLEE.

FILED MARCH 13, 1915. No. 17,982.

1. **Negligence: OPERATION OF ELEVATOR.** It is not negligence *per se*
to operate an elevator without a call bell in an unfinished build-
ing, not open to the public, but only to employees and licensees
of the contractor.

2. ———: **ELEVATOR ACCIDENT: CONTRIBUTORY NEGLIGENCE.** One who
desires to call an elevator in an unfinished building should act
with care and caution. An elevator shaft is a place of danger, and
if one carelessly thrusts his head, through an opening in the
door, into the shaft, and on account of such negligence he suffers
injury, he is not entitled to recover damages.

APPEAL from the district court for Lancaster county:
ALBERT J. CORNISH, JUDGE. *Affirmed as to the First Na-
tional Bank and reversed as to the Selden-Breck Construc-
tion Company.*

*Greene, Breckenridge, Gurley & Woodrough,* for appel-
lant.

*Burr, Green & Green, C. S. Allen* and *Hall & Bishop,* contra.

LETTON, J.

In 1911 the Selden-Breck Construction Company was engaged in constructing an eight-story office and bank building for the First National Bank of Lincoln, under a contract with that bank. This action is to recover damages against the owner and contractor for negligence in operating an elevator in the building. Verdict and judgment against the contractor, and in favor of the bank. Defendant Selden-Breck Construction Company appealed, and plaintiff has filed a cross-appeal against the bank.

On Sunday, April 30, 1911, the plaintiff, with one McKee, was helping to move the office furniture of the Western Fire Insurance Company by which they were employed, into rooms on the fifth floor to be occupied by it in the new building. The building was not entirely completed, but under the terms of the contract it was to be finished and delivered to the owner on the next day, May 1, 1911. There were two elevators in the elevator shaft. The elevator on the north side was being used by the workmen, and on this day by those moving into the building. The building was not open to the public. There were double sliding doors of metal in place in front of each elevator, with spaces for four panes of glass in each, but the glass had not been inserted. No call bells had been installed, and it was necessary to call for the elevator when wanted. On the north elevator the steel frame and the permanent floor of the car were in position, but a temporary plank floor had been laid over it, and a temporary cage of boards had been constructed to be used until the building was finished. The other elevator was not in use. At noon Curtis, the elevator operator who had been operating it for the contractors, went to lunch, and one Brackett took his place at the direction of Mr. Holmes (who was the president of the Western Fire Insurance Company, and was also the manager of the building for the bank) and Mr. Cunningham, the engineer of the building for the bank.

A few moments afterwards the plaintiff and McKee, who were still upon the fifth floor, wanted to descend. They went to the elevator shaft, the doors of which were closed. There was a full-sized outside window in the shaft—opposite the doors. Each put his head through one of the empty panes in each door, for the purpose of calling the elevator. Almost immediately the elevator descended from the sixth floor, striking each upon the back of the head. Plaintiff's jaw was caught between the bottom of the elevator and the bar across the door, breaking the bone and causing other severe injuries. The instant Bracket, who was operating the elevator, saw the men's shoulders, he reversed the lever, and this undoubtedly saved their lives.

The allegations of negligence are that the car was being operated by a conductor without a license; that on account of the absence of a call bell the defendants instructed the plaintiff to call the conductor orally; that the elevator car was unfinished, and was being run contrary to the laws of the state of Nebraska and ordinances of the city of Lincoln; that the defendants were negligent in "operating, managing and controlling said elevator car, and in running and in stopping the same," and "in not giving notice to plaintiff of the time when said car would be lowered to and approach said fifth floor of said building, and in not placing a guard or a railing or protection in front of said iron doors and windows of said car." It is also alleged that "plaintiff, obeying the instructions and invitations of said defendants and their servants, stepped to said elevator on the fifth floor of said building on the 30th day of April, 1911, to call said conductor orally to stop said car at the fifth floor, and, while in the act of so doing, the defendants" carelessly and negligently ran the car so that it struck plaintiff on the head and caused severe injuries, which are specifically described. The answers are general denials and pleas of contributory negligence.

It is necessary to examine the evidence in order to determine the principal questions involved. Brackett, who is an elevator operator, testified, for the plaintiff, that the elevator was in all respects, except as to the steel cage, in

the same condition as it now is; that electric wires and the balancing chain were hanging below the floor of the car. This chain is shown by other testimony to be 200 feet long, and to be connected at one end to the bottom of the car floor, and at the other to the counter-balance weights, so that when the elevator is at the top of the shaft the entire length of the chain. hangs below· in plain sight. · He had been instructed to take charge of the elevator until 1 o'clock, while Curtis, the conductor employed by the contracting company, went to lunch. Just after he had taken charge of the car some one called for the car to come to the sixth floor. When he reached there the man had gone. He started the car down, and the accident occurred. Most of the workmen had gone to lunch at the time, and there was very little noise in the building. There was no top or covering over the car, and if one stood back from the 'door at the fifth floor and called for the car he could hear him when he was at the bottom of the shaft. The car was in perfect running order. He was employed by Mr. Holmes, and had been helping the insurance company to move that morning, but he was to run the elevator in the completed building.

Mr. McKee testified that he worked for the Western Fire Insurance Company; that he went up and down a number of times that morning before the accident; that the only way to call the car was "to holler for it through the window." He says he also called by putting his head through the door where the window would be. At the instant before the accident "I put my head in there, I couldn't see anything or hear any elevator coming. Everything was quiet; not a sound. The elevator never made a noise; there was no noise when we went to the elevator shaft; there wasn't a sound." On cross-examination he testified that there was noise of moving desks at the time and a noise on the first floor; that when he was not using the elevator he was not in a position where he could see whether it was going to the sixth, seventh or eighth floor; and that he heard men at work above the fifth floor. Mr. Taylor, another employee of the insurance company, testified that

about a score of workmen were in the building, several in the stories above the fifth floor; he does not remember seeing any chains or wires attached to the bottom of the car.

The plaintiff testified that he went up and down about 10 or 20 times that morning; that he went no further than the fifth floor that day, and did not see the elevator go higher; that a great many men were working in the building; and the noise disturbed him in calling for the elevator. He said, "We always would look to see where the elevator was, if there was anything moving, or if it was coming or if it was going; and there was nothing in sight, so I put my head in and called for it. Q. How light was it in there? A. *As light as day; in fact, it was midday.* Q. Did you hear anything? A. No, sir. Q. What did you do when you put your head in there? A. Called for the elevator to come up. Q. Which way was your mouth or head then? A. Down; face down. Q. How long did you have your head in there before you were injured? A. About a second." On cross-examination he testified that he knew the car was drawn by cables, and that he did not see the cables, and that the shaft was empty when he looked in. On redirect examination he was questioned as to a conversation with Curtis, the elevator man, and Mr. Holmes, the first time he went up in the elevator, and was asked to state fully what Curtis said as to the height the elevator would run. A number of questions directed along this line had previously been excluded, but the objection to this one was overruled. A motion was made to strike out the answer as incompetent, irrelevant, and immaterial, and not relevant to any issue in the case, which was overruled. He then testified that in the morning of that day Curtis, Taylor and himself were going up with the first load of books, papers, desks, etc.; that Mr. Holmes said to the operator, "We go to the fifth floor," and that Curtis said, "Then during the time that you are moving in I don't go above the fifth floor." There is a great mass of evidence more or less relevant, but the gist of that in behalf of the plaintiff material to the determination of the case has been outlined.

Were the defendants or either of them guilty of negligence?  The building was incomplete, but the elevator, except for the absence of the call bell was in perfect running order.  When plaintiff elected to use the elevator in its unfinished condition he was bound to govern his conduct accordingly.  He was as fully aware of all the circumstances as the defendants were, and knew the manner in which it was necessary to call for the elevator.  There is no proof that the construction company invited the Western Fire Insurance Company or its employees upon the premises.  The fact seems to be that that company began to move on that day for its own accommodation.  We must consider the plaintiff's case regardless of the testimony for the defense, which denies much of plaintiff's evidence and is to the effect that any one looking in the shaft could tell at once by the absence of the suspension cables that the car was above that floor, and that the bottom of the car at the sixth floor could be plainly seen from the lobby outside of the doors on the fifth floor.

Unless it was negligence, as a matter of law, to use the elevator without a call bell, no negligence in its operation has been shown.  We are satisfied that under all the circumstances it was not negligence *per se* to so operate it, and that it could be used without danger by one calling into the shaft while standing outside of the bars.  There is absolutely no evidence that any one ever failed in getting a response while calling in this manner.  That plaintiff and his witnesses did not call in this manner is not material.  They should have done so.  We are convinced that plaintiff was guilty of gross contributory negligence in thrusting his head through the opening.  He had no right to place any part of his person beyond the barrier of the door and into a place so full of dangerous possibilities as an elevator shaft, more especially in a new eight-story office building with modern high-speed elevators.  His action amounted to the opening of the closed door, which he had no right to do, or, rather, it had the same effect.  Ordinary care and prudence should have warned him that it was exceedingly dangerous to place his head into the

elevator shaft. The supreme court of Massachusetts say in *Ramsdell v. Jordan*, 168 Mass. 505: "It is so plainly dangerous for a person to put his head into an elevator well for the purpose of shouting up the shaft for the car to come down that the verdict for the defendant was rightly ordered." *Knapp v. Jones*, 50 Neb. 490; *Bedell v. Berkey*, 76 Mich. 435; *Guichard v. New*, 41 N. Y. Supp. 456; *Kappes v. Brown Shoe Co.*, 116 Mo. App. 154, 90 S. W. 1158; *Knox v. Hall Steam-Power Co.*, 23 N. Y. Supp. 490; *Dieboldt v. United States Baking Co.*, 25 N. Y. Supp. 205; *Mau v. Morse*, 3 Colo. App. 359. The latter case is very similar in its facts to this. The court say: "If a man, in his sound senses, with his eyes open, voluntarily and deliberately, even if carelessly, thrust himself into the jaws of death, we know of no theory upon which any one can be held responsible for the consequences of his act but himself."

As we view the case, it is unnecessary to consider the merits of the cross-appeal, since we find no negligence in the operation of this car by Brackett. It is not contended that Curtis was in the service of the bank. The elevator was under the control and management of the construction company at the time of the accident, though Curtis was relieved by Brackett for the lunch hour. It was using it for its workmen, and incidentally to accommodate tenants who were moving in. *Fuller Co. v. McCloskey*, 228 U. S. 194. The opinion in the case of *Munsey v. Webb*, 231 U. S. 150, on which much stress is laid by the plaintiff, seems to have little relevancy to the question involved here.

It is argued that, on account of the statement and promise made by Curtis, plaintiff was misled and believed there was no danger in putting his head into the shaft. This promise and its breach are not alleged as a ground for recovery. "Where a pleader relies upon one or more specific acts or omissions as negligence, then evidence of any act or omission not within some of such specifications is irrelevant." *Omaha & R. V. R. Co. v. Wright*, 49 Neb. 456. *Elliott v. Carter White-Lead Co.*, 53 Neb. 458. We are convinced that this evidence was erroneously admitted, and that instruction No. 8, which places this is-

Wright v. Selden-Breck Construction Co.

sue before the jury and instructed them that, "if you be-
lieve from the evidence that the plaintiff was informed that
the elevator would not go higher than the fifth floor, and
that he believed and had reason to believe that such was
the case, then the question whether or not he would be
guilty of negligence, or contributory negligence, in thrust-
ing his head into the shaft becomes one for you to deter-
mine from all the facts and circumstances of the case,"
should not have been given.  But taking the testimony as
to this statement as true, and considering it as within
the issues, we are unable to see how it afforded any justi-
fication for the plaintiff's act.  In the first place, the most
natural meaning to be ascribed to the statement, under the
circumstances in which it was made, with men at work all
over the building, and with the elevator filled with furni-
ture, books, etc., is that, when Mr. Holmes said, "We go to
the fifth floor," and Curtis said, "Then during the time you
are moving in I don't go above the fifth floor," he meant
that he would not go above the fifth floor while carrying
their effects; not that he would cease to operate the ele-
vator above that floor.  Another consideration is that the
statement only had reference to what Curtis himself would
do.  It did not constitute a promise or agreement that the
elevator would not be taken by others above that floor.
His statement had reference to his own action alone, and
not to that of any other operator.  He could not control
the action of his employer or of any other of the employees
and plaintiff had no right to assume, if he did assume,
that he could do so.  In whatever light we view this con-
versation, we can see nothing in it which would justify the
plaintiff in projecting his head or body beyond the bar-
riers and through the door into such an exceedingly dan-
gerous situation.

The judgment of dismissal as to the bank is affirmed.
The judgment against the construction company is re-
versed.

JUDGMENT ACCORDINGLY.

MORRISSEY, C. J., not sitting.