AMERICAN AIRLINES, INC., *v*. SHELL OIL COMPANY, INC.

1. NEGLIGENCE—DIRECTED VERDICT—EVIDENCE.

It must be a very clear case before a trial judge is justified in taking the issue of negligence from the jury.

2. BAILMENT—AIRPLANE REFUELER—NEGLIGENCE—EVIDENCE.

Evidence, even when viewed in the light most favorable to plaintiffs, in action by airplane owner, bailee of airplane refueler tank truck, and subrogee, against bailor thereof *held*, as a matter of law insufficient and too speculative to sustain various claims of negligence by both bailor and bailee as to installation, servicing, inspection, maintenance, and use of the refueler and apparatus thereon incident to action arising from fire loss that occurred while used in ordinary refueling operation when hose connection became disengaged, where it appears that reinstallations, inspections and tests had occurred frequently and recently.

3. NEGLIGENCE—KNOWLEDGE OF RISK OF INJURY.

Knowledge is fundamental to liability for negligence as the actor either does foresee an unreasonable risk of injury or

REFERENCES FOR POINTS IN HEADNOTES

[1] 38 Am Jur, Negligence § 344.
[2, 4, 5, 8] 6 Am Jur, Bailments §§ 26, 170, 377 *et seq.*
   Liability of bailee of airplane for damage thereto.  17 ALR2d 913.
[3] 38 Am Jur, Negligence § 23.
[6, 7] 41 Am Jur, Pleading §§ 256–260.
[9] 6 Am Jur, Bailments §§ 75, 172, 181.

could foresee it if he conducted himself as a reasonably prudent man under the circumstances.

4. BAILMENT—NEGLIGENCE—CONTRIBUTORY NEGLIGENCE—EVIDENCE.

Damages resulting from defects in refueler equipment supplied by bailor to bailee for use in refueling latter's airplanes and which each party repeatedly and frequently inspected and tested as the operation was a highly hazardous one would not subject either to liability, where, if evidence of bailee shows the bailor to have been guilty of negligence, it would have tended to establish the bailee's contributory negligence.

5. SAME—AIRPLANE REFUELER—DEFECTIVE HOSE—EVIDENCE.

Evidence presented in bailee's action against bailor and cross action by bailor against bailee for damages sustained when a hose connection in airplane refueler became disengaged during routine refueling operation *held*, without proof as to whether the hose was defective when installed some 9 months theretofore or became so during the 9 months of use, if the hose was defective.

6. PLEADING—CROSS DECLARATION—NEGLIGENCE—STATUTES.

The right to file a cross declaration is created by statute and refers to negligence actions (CL 1948, § 615.11).

7. SAME—CROSS DECLARATION—RECOUPMENT—TORTS—CONTRACTS—NEGLIGENCE.

Cross declaration, based on claim under contract, was properly filed as recoupment in tort action, where the tort claim and contract claim both arose from the same occurrence and involved the same issue of negligence (CL 1948, §§ 615.3, 615.10, 615.11; Court Rule No 23, § 5 [1945]).

8. BAILMENT—AIRPLANE REFUELER—DAMAGES—STIPULATIONS.

Trial judge should have directed verdict for defendant bailor of airplane refueler, where lease thereof required bailee to insure it and bailee failed to produce proof of claimed negligence on part of bailor which resulted in total loss of refueler, the amount of such loss having been stipulated.

9. SAME—CONTRACTS.

Generally, the terms, express or implied, of the contract of bailment determine the rights, duties, and liabilities of the parties each to the other.

Appeal from Wayne; Brennan (Leo J.), J. Submitted April 11, 1958. (Docket No. 48, Calendar No. 47,276.) Decided January 12, 1959. Rehearing denied February 19, 1959.

Case by American Airlines, Inc., a Delaware corporation, and Continental Insurance Company, its subrogee, against Shell Oil Company, Inc., a Delaware corporation, for property damage and operating loss arising from fire during refueling of cargo aircraft. Cross declaration, based on negligence and on lease agreement, by Shell Oil against American Airlines for loss of refueling equipment. Directed verdict and judgment of no cause of action as to all parties. Plaintiffs appeal. Defendant cross-appeals. Affirmed in part and reversed for entry of money judgment for defendant under provisions in lease.

*Ward, Plunkett & Cooney* (*Robert E. Rutt,* of counsel), for plaintiffs.

*Vandeveer, Haggerty, Garzia & Haggerty,* for defendant.

EDWARDS, J. This lawsuit involves a dangerous fire, a great amount of monetary damage, and a lengthy record. Each party involved seeks to establish negligence on the part of the other as to the cause of the fire and the damage it suffered therefrom. At the end of trial, the judge instructed the jury to return no cause for action as to both plaintiffs and cross plaintiff because, he said:

"All of the evidence on both sides of this case pertaining to negligence rests entirely on surmise, speculation, and conjecture."

Each party appeals, asserting that it did present evidence from which the jury could have found the other party's negligence the proximate cause of the fire and damage. In addition, the defendant and cross plaintiff (hereinafter referred to as Shell) asserts that it was entitled to recover its damages

from plaintiffs and cross defendants (hereinafter referred to as American) under a contract count which the trial judge did not mention at all.

This Court has repeatedly held that it must be a very clear case before a trial judge is justified in taking the issue of negligence from the jury as was done here. *Detroit & Milwaukee R. Co.* v. *Van Steinburg,* 17 Mich 99.

See, also, *Normand* v. *Thomas Theatre Corporation,* 349 Mich 50; *Ware* v. *Nelson,* 351 Mich 390; *Murphy* v. *Roux,* 352 Mich 97.

We proceed to analyze the instant facts with this principle in mind.

The undisputed facts are these: The fire occurred at 4 a.m. on July 19, 1952, at the Willow Run airport. An American Airlines DC–4 cargo plane was being loaded on the concrete ramp in front of a hangar and an American Airlines mechanic was engaged in filling the DC–4's wing tanks with high octane gasoline furnished by an automotive tank-trailer refueler owned by Shell but leased to and operated by American Airlines.

After placing about 75 gallons in the wing tank (with some difficulties which will be related later), the mechanic found the gasoline flow from the hose interrupted, looked down and saw a wide pool of gasoline forming on the concrete apron on the driver's side of the refueling truck, and jumped from the wing to the ground to cut off the refueler engine. Before he could get to his feet, the gasoline burst into flames engulfing the refueling unit and threatening to do the same to the DC–4.

The $600,000 plane was saved from total destruction by action of flight and ground crewmen who, while it was burning, released its brakes, hooked it to a tractor and pulled it away from the doomed refueler to a point where the fire, which had already

consumed 1 wing, could be extinguished. The record discloses no injuries to personnel.

The refueler, a total loss, was valued at $6,340. The repairs to the DC–4 cost $86,776.79, which were paid by Continental Insurance Company (subrogee of American, and party plaintiff), and American Airlines also claimed $59,532 damages for loss of use of the DC–4 during the period when it was being reconditioned for service.

Crucial to the dispute between the parties as to duties owed by each is the agreement then in effect under which Shell leased the refueler to American, the applicable provisions of which follow:

"2. Lessee has examined the above-described equipment and agrees that same is in good condition and repair and further agrees to use the equipment in a manner consistent with the purposes hereof. *Major repairs and major overhauls to such truck equipment will be made at Shell's expense, but these items shall be deemed to include only such of the following as shall not be necessitated by neglect, abuse or accident; engine overhauls; valve grinding; transmission overhauls; rear end overhauls; wheel bearings and front end alignment corrections; tire replacements; tank and pumping equipment repairs; and repairs to electrical generators, starting motors and wiring. Lessee at lessee's expense shall maintain such truck equipment in good and safe condition, shall keep the same properly lubricated and make all other repairs, including without limitation preventive maintenance repairs. Lessee shall make repairs necessitated by neglect, abuse or accident and shall be responsible for loss by theft, fire or explosion. Lessee shall notify Shell immediately of the need for any major repairs to such equipment in order to enable Shell to keep such equipment, fundamentally, in good condition and repair.* If at any time inspection by Shell reveals that repairs of the kind herein undertaken by lessee have not been made, Shell shall

notify lessee of the need for such repairs and, upon lessee's failure to make such repairs within 10 days thereafter, may make such repairs and charge the costs thereof to lessee. Lessee Shall Not Add to, Remove From, or Alter Such Equipment or any Part Thereof Without the Written Consent of Shell. * * *

"6. *Lessee shall hold Shell harmless from any and all claims and damages unless caused by the negligence of Shell* asserted against or sustained by Shell by reason of the use of the equipment hereinabove described or other operations under this lease, and lessee shall defend any suit brought against Shell on account of such claims, and pay any judgment against Shell resulting from any such suit; provided, however, that Shell shall have the right to participate with lessee in the defense of any such suit. Lessee agrees to carry the following insurance covering any liability arising out of or relating to the use and operation of the equipment above described, to-wit: Public liability insurance in the amount of: $50,000 for any 1 person killed or injured in 1 accident, $100,000 for more than 1 person killed or injured in 1 accident, and property damage insurance in the amount of $20,000. Said policies of insurance shall be obtained from an insurance company acceptable to Shell. Lessee shall furnish Shell with a certificate from the carrier, showing such insurance to be in force, if requested." (Emphasis supplied.)

It is obvious that to a large degree the common-law duties owed by these parties to each other were supplanted by the written contract quoted above.

American, however, elected to bring their suit in tort. Presumably they relied in this regard upon the exception contained in the language of paragraph 6:

"Lessee shall hold Shell harmless from any and all claims and damages *unless caused by the negligence of Shell.*"

American's claims of negligent causation by Shell are set forth thus in their amended declaration:

"That said defendant owed a duty to your plaintiffs to use due care in the maintenance, servicing and inspection of the aforedescribed tractor and tank-truck unit, but the defendant violated the same in the following particulars:

"A. In failing to properly install, service and maintain the GMC tractor and Heil tank truck, the pumping equipment and hoses attached thereto.

"B. In failing to use proper hoses, clamps and fittings, as would withstand the pressure built up by the pump installed thereon.

"C. In failing to install, service and maintain a proper pump on said tractor and tank truck.

"D. In failing to provide adequate gauges and other safety devices to maintain a proper pressure in said pumping unit.

"E. In failing to properly inspect and test said GMC tractor, Heil tank truck and various pumping equipment after substituting tractors during the month of June, 1952.

"F. In failing to employ sufficient and competent workmen to maintain, service and inspect the aforedescribed unit owned by the defendant."

Plaintiffs ask that we review their appeal from this directed verdict, not only construing the testimony as strongly as possible in their favor, but also by accepting those legitimate inferences which favor them. In this regard they rely upon the following language from *Gapske* v. *Hatch,* 347 Mich 648, 654:

"It is well-established law in Michigan that negligence may be inferred from circumstantial evidence as well as from direct proofs; and that, on defendant's appeal from a denied motion for a directed verdict, those legitimate inferences which most favor the plaintiff must be accepted. *Anderson* v. *Kearly,* 312 Mich 566; *Cebulak* v. *Lewis,* 320 Mich 710 (5 ALR2d 186); *Spiers* v. *Martin,* 336 Mich 613;

*Kaminski* v. *Grand Trunk Western R. Co.*, 347 Mich 417."

Accepting this as the law to be applied in both appeals, we can find neither testimony, nor legitimate inference from testimony, which would tend to sustain American's allegations of negligence C, E and F. As to allegation A, pertaining to claimed improper installation and maintenance of the pumping equipment and hose, more facts must be related—again from the view favorable to plaintiffs.

It is clear that the refueler was furnished by Shell and that it had, under the lease, responsibility for "major repairs," such to be undertaken when notified by the lessee. The testimony indicates that a major overhaul of this particular unit was accomplished in September of 1951, at which time Shell installed a power take-off pump on a backplate immediately behind the tractor cab. This pump was connected with the tank trailer by both inlet and outlet hoses, the latter of which served the function of feeding the gasoline under pressure back into the refueler's plumbing and ultimately into the refueling hoses which led from the top of the trailer to the wing of the plane.

The evidence establishes that in September, 1951, Shell installed new couplings at the pump connections and attached thereto new inlet and outlet hoses. These were fitted over the 6-inch ribbed steel shanks of the couplings and clamped in place with 3 metal clamps each.

Undisputed likewise is testimony that the refueler was again the subject of a major change in June of 1952 when the original Diamond T tractor was replaced by a GMC tractor. This involved removing the inlet and outlet couplings, but not the removal of the 2 hoses from the coupling shanks. The unit was last returned to American by Shell about July 2d, and

had been in service without return or notice of trouble to Shell until the fire on July 19th.

American's claim is apparently founded specifically on their deduction from evidence presented that the outlet hose blew loose from the pump outlet coupling because 1 of the clamps had been improperly applied by Shell mechanics 9 months earlier, in September of 1951. They rely in this regard upon photographs of the coupling end of a piece of the pump outlet hose, taken after the fire was extinguished and showing it lying partially burned on the concrete apron near the refueler, entirely disengaged from the pump coupling and with 2 of the hose clamps still in place, but the third clamp disengaged. They also rely upon the testimony of their mechanic who was fueling the plane and who apparently was the only man in position to give any eyewitness account. American's brief summarizes his testimony thus:

"Ben Stefaniak testified that he was a lead mechanic and had been a mechanic for American Airlines for 11 years; and further, that he had used refuelers hundreds of times per year. He testified that on the day of the accident he drove the refueler 75 or 100 feet and placed it under the wing of the aircraft and that he then attached the ground wires to eliminate static electricity and set the power take-off in the tractor to operate the pump and checked the various valves. He then got up onto the wing and attempted to fuel the aircraft, but when he opened the nozzle, he received no gasoline. He then got down and rechecked the valves and re-engaged the power take-off and also checked the various hoses and determined that they were all connected. He then returned to the wing and opened the hose nozzle and received gasoline, and at such time put about 75 gallons into a wing tank. He then waited 2 or 3 minutes for the gasoline to settle and then turned the nozzle on again. He received about 5 gallons of

gasoline when the gasoline flow suddenly stopped. He was on the wing when he noticed the flow of gasoline stop and he looked down at the ground and saw the end of a big hose, 3 inches in diameter, swishing back and forth over the edge of the platform located between the tractor and trailer. He also noticed fuel pouring out from that point. The end of the hose swished back and forth about 2 feet and the end of the hose he noticed was square and not jagged or broken. He also saw a great pool of gasoline on the left or driver's side of the truck. He immediately jumped some 15 feet from the wing of the plane to the concrete runway and fell on his hands and knees. As he was getting back up, the fire started. He ran around to the right door of the tractor and turned the ignition off to stop the power take-off."

American also presented a metallurgical expert witness, Dr. DiGuilio, who testified that in his opinion the clamp found loose after the fire had been "improperly tightened" in its original installation, and, in answer to a hypothetical question which assumed the outlet hose had come loose from the coupling shank before the fire, he said that back pressure associated with the stopping of gasoline flow had pushed the hose from the coupler. On further examination, the Doctor testified, however, that he believed that 2 of the clamps had been properly applied on the hose in question, and that he had no knowledge as to the safety factor involved in the particular installation:

"*Q.* All right. And I think you said, Doctor, what the factor of safety is with the 2 clamps in relation to the third clamp you can't tell us?

"*A.* No.

"*Q.* And, then, is it true, Doctor, that insofar as you are able to express an opinion, those 2 clamps might have had a complete factor of safety so far as the holding of the hose under ordinary operations are concerned?

"*A*. My answer to that is that every engineer designs the structure with some factor of safety. I cannot tell you whether it would be as good as 3.

"I would state, though, that if the third were not necessary, it would not be put on. That is good engineering practice. Now, what this design was, I don't know.

"*Q*. All right, Doctor. That is left entirely in the realm of speculation and guessing and conjecture as far as you are concerned?

"*A*. That is right."

We do not believe that the jury could have found from this or any other testimony in this record that the 2 clamps which plaintiffs' witness identified as being properly installed on the pump outlet hose would, if they had been the only clamps installed, represent an unsafe installation as to this pump and hose. Nor is there any evidence that Shell had knowledge of, or should have had knowledge of, any unsafe condition as to this particular hose connection.

On the contrary, the evidence is clear that this hose and its clamps had served satisfactorily for 9 months without any difficulty through daily use and numerous visual and performance tests made both by Shell and American.

American's automotive mechanic, Lantz, testified that on the last return of the refueler by Shell to American, in his presence Shell mechanics had visually inspected it, pressure- and performance-tested the refueler, including the hose connection now under consideration, and that it had passed these tests satisfactorily. He also testified that he made the same tests with satisfactory results on July 17th, 2 days before the fire, when the refueler came into the American repair shop because of a refueling hose break. At that time he did the last maintenance work performed on the unit before the

fire. Thus this record clearly shows that neither Shell nor American had any knowledge of any unsafe condition as to this hose connection in spite of repeated inspections and tests thereof by both.

"Knowledge is fundamental to liability for negligence. The very concept of negligence presupposes that the actor either does foresee an unreasonable risk of injury, or could foresee it if he conducted himself as a reasonably prudent man." 2 Harper & James, Law of Torts, § 16.5.

See, also, *Livesley* v. *Continental Motors Corporation,* 331 Mich 434; *Green* v. *Atlantic & C. Air Line R. Co.,* 131 SC 124 (126 SE 441, 38 ALR 1448).

Here we have neither proof of actual knowledge nor of failure of a duty to inspect properly for such knowledge. *Cf., MacPherson* v. *Buick Motor Co.,* 217 NY 382 (111 NE 1050, LRA1916F, 696, Ann Cas 1916C, 440).

Further, if we were to assume defective application of 1 of the clamps and defendant's knowledge thereof, either constructive or implied, we do not find in this record testimony from which the jury could have found such to have been the proximate cause of the fire, since there is no evidence from which the jury could have found the other 2 clamps (admittedly properly applied) inadequate to hold the hose on the coupling shank.

Indeed, the only testimony pointed to by plaintiffs as offering a reasonable inference that this outlet hose became detached from the pump coupling *before,* as opposed to during or after, the fire is that of American's mechanic Stefaniak pertaining to his observation of gasoline spillage in that vicinity and his seeing the hose "sticking out, I'd say a foot over the platform" and "swishing back and forth and fuel running around."

From our study of the photographs of the installation, this testimony seems to us to suggest a reasonable inference that the outlet hose was at that point still connected to the pump coupling and that it had burst, come loose or been cut at an entirely different point than that to which plaintiffs addressed their attention and for reasons as to which this record leaves us completely in the dark.

As to American's claim of negligence pertaining to Shell's failure to make a proper installation of the outlet hose upon the pump-coupling shank, we believe the trial judge was correct in terming the evidence too speculative to submit to a jury.

We have dealt at this length with this particular claim of negligence because the record indicates that American's testimony was designed to emphasize it both as their principal assertion of negligence against Shell and as their principal defense to Shell's countersuit on contract.

Before leaving the negligence aspect of this case, however, we should note negligence claims B and D advanced by American's declaration pertaining to Shell's failing to furnish proper hose material and failing to furnish pump pressure safety devices.

This was obviously a highly hazardous operation. Even more obvious is the fact that a damaging fire did result from some failure of the refueler, or some facet of the operation of same, on the morning in question. Each party had a duty to the other, and to third parties, to conduct the maintenance and operation of this refueler with a high degree of care. It would appear that with these gross facts a minimum of proof as to the alleged negligence might suffice to offer legitimate inferences which might be drawn by a jury under our holdings in *Gapske* v. *Hatch, supra,* and *Kaminski* v. *Grand Trunk Western R. Co., supra.*

Quickly it should be said that we simply do not find testimony in this record wherein American ever sought to prove the installation by Shell of improper or defective hose material, or the existence of a pump-pressure safety device which, if used, might have avoided the accident.

This would appear surprising except for the obvious fact that under the lease agreement and the facts of this case, American had at least an equal duty and certainly a superior opportunity to inspect for, to know, and to take steps to avoid such hazards as these. The record discloses no protests from American about hose material or safety devices prior to the fire. Hence, the more American might prove Shell's negligence as to such items, the more definitely they would have tended to establish their own contributory negligence.

American's brief does emphasize as to negligence claim B, the testimony of 1 of Shell's employees who stated that in his opinion the pump outlet hose had burst, and then answered "yes" to the question: "Was it your opinion that the hose was defective which caused it to rupture?" Accepting the favorable view of this testimony as establishing both defect and rupture, the record still leaves us, as it did the trial judge, completely in the dark as to whether the defect was inherent in the hose orginally furnished, or whether it was acquired during its 9 months of service. The record is devoid likewise of any proof of Shell's actual knowledge of any such defect, or of any failure on its part to inspect for such knowledge.

Here, American had operation and control of the instrumentality which failed. They had the burden of proof to show that the failure was due to defendant's conduct rather than their own. Whatever the situation might be as to a third party to whom both of these parties might have owed joint duties, we

cannot find testimony which serves directly, or by legitimate inference, to allocate the responsibility for the failure of the hose to Shell.

"To establish negligence there should be either direct proof of the facts constituting such negligence, or proof of facts from which negligence may be reasonably presumed. Its existence may not rest in mere conjecture or in the mere possibility that the accident or injury may have occurred in a particular way."   38 Am Jur, Negligence, § 332, p 1031.

American's proofs as to these 2 claims cannot be held to have established a prima facie case and we believe, that as to American, the trial judge was correct in directing a verdict.

On similar grounds of surmise and conjecture, the trial judge likewise dismissed Shell's cross declaration.   Because we dispose of the cross declaration on other grounds, we make no detailed examination of Shell's negligence allegations beyond noting that its proofs offered no more specific evidence as to the cause of the fire than American's did.

The trial judge, in directing a verdict, however, plainly overlooked Shell's rights under its contract count.   The lease flatly required American to "be responsible for loss by theft, fire or explosion," and to "hold Shell harmless from any and all claims and damages unless caused by the negligence of Shell," and required American to insure this risk.

The lease in this regard is unambiguous.   American has failed to produce proof of their claim of negligence on the part of Shell.   The damages to the refueler are stipulated by the parties to be $6,340. There is no issue of fact to be determined as to this count.

"As a general rule, the terms, express or implied, of the contract of bailment determine the rights, du-

ties, and liabilities of the parties each to the other." 6 Am Jur, Bailments, § 172.

See, also, *Smith* v. *McGill,* 27 Mich 142; *Johnston* v. *Miller,* 326 Mich 682; *Commercial Acetylene Supply Co.* v. *Fox,* 47 Cal App 673 (191 P 33).

It is true that Shell sought to assert its right of reimbursement under the refueler lease as a second count of a cross declaration. The right to file a cross declaration is created by statute and refers to negligence actions. CL 1948, § 615.11 (Stat Ann § 27.836).

Since, however, Shell's claim under the contract arose from the same occurrence which gave rise to the tort action, it could properly have been plead in recoupment. CL 1948, §§ 615.3, 615.10 (Stat Ann §§ 27.828, 27.835) ; *Moskin* v. *Goldstein,* 225 Mich 389.

The issue involved was clearly stated and completely and separately set forth as a separate count (See Court Rule No 23, § 5 [1945]). By nature of the contract, it involved the same issue of negligence which was tried in the principal case. It would clearly be folly to require retrial. See *Pierce* v. *Underwood,* 103 Mich 62.

Confronted with such a situation, this Court considered such a count in a cross declaration as a notice of recoupment and affirmed an order entered thereon. *Lyons* v. *City of Grand Rapids,* 305 Mich 309.

See, also, *Watson-Higgins Milling Company* v. *Pere Marquette R. Company,* 328 Mich 5.

We follow the *Lyons* precedent in this case. On Shell's motion, the trial judge should have directed a verdict on Shell's claim of recoupment in the sum of $6,340.

For the reasons stated, the judgment of no cause for action entered in favor of defendant Shell is affirmed; and the judgment of no cause for action entered in favor of cross defendant American is re-

versed for entry of the judgment indicated above.
Costs to appellee and cross appellant.

DETHMERS, C. J., and CARR, KELLY, SMITH, BLACK,
VOELKER, and KAVANAGH, JJ., concurred.