## NORMAND v. THOMAS THEATRE CORPORATION.

1. NEGLIGENCE—CONTRIBUTORY NEGLIGENCE—DIRECTED VERDICT—EVIDENCE.

   A motion for a directed verdict on the ground that plaintiff was guilty of contributory negligence as a matter of law may only be granted when the evidence is such that all reasonable men would conclude with unanimity that the plaintiff was guilty of no care at all.

2. SAME—CIRCUMSTANCES OF ACTION.

   A determination as to whether ordinary care has been used is related to the circumstances under which a person does, or fails to do, something.

3. THEATERS AND SHOWS—CONTRIBUTORY NEGLIGENCE—UNLIGHTED STAIRWAY.

   Whether or not plaintiff, a married woman, was guilty of contributory negligence in falling down unlighted stairway after opening unlocked door while assisting her stepfather in locating

REFERENCES FOR POINTS IN HEADNOTES

[1, 3] 38 Am Jur, Negligence § 348.
[2] 38 Am Jur, Negligence § 29.
[4] 15 Am Jur, Damages §§ 234, 235.
   Adequacy of damages in action by person injured for personal injuries not resulting in death (for years 1941 to 1950).  16 ALR2d 393.
[5] 20 Am Jur, Evidence § 120.

light switch in vicinity of men's toilet at theater *held*, a matter for consideration by jury, where defendant was admittedly negligent.

4. DAMAGES—LEG INJURY—ARM INJURY.

Jury verdict of $10,000 to plaintiff woman who fell down unlighted stairway at theater *held*, not excessive, in view of the reduced value of today's dollar, where it appears she sustained a leg injury which left a scar 3-1/2 inches long below her left knee and sustained a partial loss of supination of the right hand and forearm resulting from fracture of the radius at the elbow and spent $804.50 for expenses.

5. EVIDENCE—COMMON KNOWLEDGE OF ECONOMIC DEVELOPMENTS.

Economic developments are so much a matter of common knowledge that judges and juries are entitled to consider them although not expressly proven in evidence.

Appeal from Houghton; Brennan (Leo J.), J. Submitted June 4, 1957. (Docket No. 4, Calendar No. 47,086.) Decided July 31, 1957.

Case by Irene Normand against Thomas Theatre Corporation, a Michigan corporation, for personal injuries sustained when she fell in dark stairway. Verdict and judgment for plaintiff. Defendant appeals. Affirmed.

*Messner & LaBine,* for plaintiff.

*Donnelly & O'Brien,* for defendant.

BLACK, J. The defendant's theater in Calumet opens from the street directly into the "theater lobby." The lobby is a little over 32 feet in length and parallels the street. As the patron enters he finds the ticket office to his left, at end of the lobby, and the rest-room entryways to his right, at the other end. The theater proper is straight ahead.

About 5:50 in the afternoon of February 24, 1955, plaintiff and the presently-identified members of her family left nearby Lake Linden for Calumet, intend-

ing to see the movie show scheduled that evening—starting at 6:30—by defendant. The party consisted of plaintiff, her husband, plaintiff's mother and stepfather, and plaintiff's daughter. They arrived at the theater shortly after 6 o'clock and, noting that the theater lights had not yet been turned on, waited in their parked automobile until the theater manager and the ticket clerk arrived. As soon as the latter arrived and turned on the theater lights, plaintiff's party left the parked car and entered the lobby. The stepfather (aged 67), described in the record as having "high blood pressure and heart trouble and he is awfully excitable and nervous," needed personal relief. Upon entry the old gentleman inquired of plaintiff for guidance to the men's room and, being shown the doorway to the right with designation "gentlemen" above the casing, proceeded to enter it.

We turn now to construction details of the doorway and entry. As one faces the door, it is hinged at the left and opens inward to the left. The opening arc is limited to 90 degrees. Just inside the doorway and at level with the lobby floor is a platform measuring 4 feet and 2 inches (this measurement is straight in from the doorway) by 5 feet (measured parallel to the closed door). A stairway descends straight ahead, from the doorway and platform. It leads to the basement of the building where the rest facilities are located. The stairway consists of 10-inch steps with 7-inch risers, and it extends far enough to complete a vertical descent of 8 feet (from platform level to basement level). The stairway and platform are supported at the right by a partition leading from the right side of the door casing and at right angles thereto. This partition extends to and beyond the end of the stairs. A hand rail extends along the partition, from top to bottom of the stairway. Just inside the mentioned doorway and at proper height, an electric switch—set in the par-

tition wall—provides means of lighting the stairway and platform. Such lighting equipment was in proper working order but had not yet been turned on when the stepfather sought to use the mentioned facilities.

The stepfather, having stepped inside to the platform and finding it completely dark inside the doorway, called to plaintiff for aid in finding the light switch. Her husband at the time was at the other end of the lobby, waiting at the ticket office for the latter to open. Plaintiff stepped through the doorway and attempted to find the switch by feeling along the partition wall. At that time her stepfather had his back to the partition wall near the doorway, and it is apparent that he was thus unwittingly concealing from plaintiff the switch she was looking for. Plaintiff took 2 steps forward, feeling meanwhile for the switch, and thereupon stepped over the first step of the stairway. She fell to the basement and received personal injuries for which this action was brought against defendant.

Suit having been instituted in the Houghton circuit, the case was tried to court and jury, Honorable Leo J. Brennan, circuit judge presiding, and resulted in a verdict and judgment for plaintiff in the sum of $10,000. Defendant reviews and insists that its motion for directed verdict, counting on contributory negligence, and its reserved motion for judgment notwithstanding verdict,* should have been granted. It contends further that the verdict was excessive in amount.

. Defendant's negligence was conceded at close of proofs. The concession is shown this way in the separately-certified transcript:

---

* See CL 1948, § 691.691 (Stat Ann 1955 Cum Supp § 27.1461).— REPORTER.

"*The Court:* Let the record show at this time at the close of the arguments and before the court instructs the jury, that counsel for the defendant has admitted negligence on the part of the defendant because of its failure to have a light on in the room leading to the men's toilet when the front door of the theater was unlocked and when patrons were on the premises. Is that a correct statement of the situation?

"*Mr. Donnelly* (defendant's counsel): Yes, your Honor.

"*The Court:* Mr. Messner, you understand that?

"*Mr. Messner* (plaintiff's counsel): That is my understanding, yes."

*First: Was plaintiff guilty of contributory negligence?*

In 1896, following then recent lead of the supreme court, the court of appeals of the 8th circuit prepared a helpful brief addressed to this question.[*] The occasion was a suit for negligence, brought by a Northern Pacific railroad passenger. At near midnight—it was Near Year's eve—the plaintiff went forward from the rearmost pullman (where plaintiff and wife were berthed) to seek out the conductor for information regarding a proposed stop-over. The passageway of each pullman—at each end—consisted of right angle reverse turns leading to enclosed vestibules. At the time in question, an outer door "opening upon the steps" of one of the vestibules had been left open. This vestibule was unlighted at the time, although dimmed lamps within each car shed some but not much light therein. The plaintiff, having gone forward and having completed his business with the conductor, returned to the vestibule just described and, mistaking the vestibule platform for the passageway turning left and then right in the car to be entered, turned left in the vestibule and

---

[*] *Bronson* v. *Oakes* (CCA), 76 F 734.

fell from the rapidly moving train. The train was proceeding on a trestle over Lake Pend d' Oreille in an uninhabited region of northern Idaho, and plaintiff was precipitated into the icy waters below as the train proceeded westward toward the coast. (Yes, he did survive.)

Was he guilty of contributory negligence? The court answered in the negative with this preface, the conception of which took place in Michigan (p 739, 740 of report):

"In *Jones* v. *East Tennessee, Virginia & Georgia R. Co.*, 128 US 443, 445, 446 (9 S Ct 118, 32 L ed 478), the lower court instructed the jury to render a verdict for the defendant upon the ground that the plaintiff had been guilty of contributory negligence, but the supreme court reversed the judgment, saying:

" 'But we think these questions [of negligence] are for the jury to determine. We see no reason, so long as the jury system is the law of the land, and the jury is made the tribunal to decide disputed questions of fact, why it should not decide such questions as these as well as others.'

"It does not follow, however, that because it is the exclusive province of the jury to determine the question of negligence, that in no state of facts can the court withdraw the case from the consideration of the jury. Although the rule as to when the case is one for the jury and not for the court has been variously stated, the various statements have the same meaning. The rule is frequently laid down in these terms: That when the evidence in any given case is conflicting, or the facts disputed, or where the facts are of such a character that different minds might draw different conclusions from them, the case must be left to the jury for their determination. Another statement of the rule is that a case should not be withdrawn from the jury unless the conclusion follows as a matter of law that no recovery can be had upon any view which can be properly taken of the facts the evidence tends to establish. Probably

the most satisfactory statement of the rule, and the one easiest to comprehend and apply (*Scott v. City of New Orleans,* 75 F 373, 377), is that given by the supreme court in *Grand Trunk R. Co.* v. *Ives,* 144 US 408, 417 (12 S Ct 679, 683, 36 L ed 485, 489), where it is thus stated:

" 'When a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence is ever considered as one of law for the court.'

"And in such cases the court merely declares the evidence is insufficient in law because insufficient in fact. When, therefore, it is said that a given act does or does not constitute negligence in law, the statement means no more than that in the judgment of all reasonable men—not judges alone, for it concerns a fact, and not a question of law—it would be esteemed such. When it can be affirmed that all reasonable men would agree as to the quality of an act in respect of its being either negligent or prudent, the court may give effect to such concensus of opinion, and direct a verdict in accordance therewith. The direction is given, not because it is the judge's opinion alone, but because the judge is able to say that it is also the opinion that all reasonable men would entertain of the question. If there is doubt as to whether all reasonable men would draw the same conclusion from the evidence, then the question must be submitted to the 12 reasonable men appointed by the constitution to determine disputed or doubtful questions of fact. The rule on the subject is well stated and illustrated by Judge COOLEY in delivering the opinion of the court in *Detroit & Milwaukee R. Co.* v. *Van Steinburg,* 17 Mich 99, 120. The learned judge said: (Here follows extended quotation appearing most recently in *Davis* v. *New York Central R. Co.,* 348 Mich 262, 268, 269)."

Note· the test-expression—"*all* reasonable men"—
and repetitive employment thereof.  It is our test
(see full assembly of·Michigan cases in *Scharman* v.
*Bay County Bridge Commission,* 158 Mich .77, 83;
and *Beach* v. *City of St: Joseph,* 192 Mich 296,· 301),
and early rules governing its application· were stated
with definitive care in *Lake Shore & Michigan
Southern R. Co.* v. *Miller,* 25 Mich 274.  When a mo-
tion for instructed verdict counting on contributory
negligence is presented, ·the trial judge becomes a
sort of assayer of evidence and his cupel admits of
motion-grant only when it discloses that *all* reason-
able men would conclude with unanimity that the
plaintiff was guilty of "no care at all" (quotation
from *Miller, supra,* 292).*

We turn from these premises to defendant's con-
tention that Judge Brennan should have directed a
verdict in its favor on ground that Mrs. Normand
was guilty of contributory negligence, pronounceable
by the court.  Defendant says—and this is the es-
sence of its motion—that a person exercising ordi-
nary care under corresponding circumstances would
have sought help from the manager or ticket clerk
and would not have undertaken to search for the
switch in darkness.  That may be true—we say
"may"—, but who should make the pronouncement?
The judge on motion, or the jury the parties have
selected?  Specially aidful in solution of the problem
is the rule this Court adopted—from Connecticut—
in *Brebner* v. *Sidney Hill Health System, Inc.,* 269
Mich 541, 544 (followed in *Flynn* v. *Kramer,* 271
Mich 500, 505; *Warwick* v. *Blackney,* 272 Mich 231;
*Davis* v. *New York Central R. Co., supra*).  It is
not what one does, alone and apart from other con-

---

* This does not mean that in no case should a verdict be instructed
(see above quotation from *Oakes* and discussion in *Miller* commencing
at page 293 of report).  It does mean that the case must be a very.
clear one which would justify the court in so proceeding.

siderations, which is to be judged in determining whether ordinary care has been exercised. "What one does or fails to do as relates to the circumstances under which he acts is the test to be applied." (Quotation from *Flynn,* p 505 of report.)

What were the circumstances, and the facts, under which Mrs. Normand assumed to aid her stepfather? Was the time-need of a testy and infirm old gentleman critical? We note that the party entered the theater as soon as it "opened up;" that the ticket office had not yet opened when the party entered and that the theater manager—this is on favorable view of course—was busy getting ready for projection behind closed doors. Was either the manager or clerk immediately available for the assistance defendant says plaintiff should have sought? Should the plaintiff, a lady, have called her husband from the other end of the lobby to aid her stepfather? Is a theater patron, not familiar with the theater and its facilities, called upon—in law, not fact—to expect that a full length stairway starts descent near the orbit of an inward swinging rest-room door? Were the circumstances such as to place a person of reasonable prudence on guard against entering, in darkness and to the linear extent shown, a public place of such nature?

Mere presentation of these questions shows all too clearly that a jury of the vicinage is better equipped to answer than is a single judge and that we have no right, short of arbitrary usurpation of this jury's constitutional function, to affirm that *all* reasonable men would reach conclusion of concurrent fault on Mrs. Normand's part. The trial judge was consequently right in denying defendant's said motion and the later motion for judgment notwithstanding verdict (Compare *Corfeld* v. *Douglas Houghton Hotel Co.,* 324 Mich 459).

In arriving at conclusion that the question of contributory negligence was properly submitted to the jury, we have not overlooked the authorities defendant relies upon.  They are *Bedell* v. *Berkey,* 76 Mich 435 (15 Am St Rep 370) ; *Steger* v. *Immen,* 157 Mich 494 (24 LRA NS 246) ; and *Elliott* v. *Dahl,* 299 Mich 380.  Examination of these cases discloses serious question as to existence of a duty of the respective defendants to each plaintiff.  They show, too, that the primary question of negligence was passed over in each instance.  Such authorities do not apply when the defendant's causal negligence is either conceded or becomes a question for the jury.  As we have previously seen (*Clark* v. *Shefferly,* 346 Mich 332) the question of contributory negligence is usually judged, not alone by what the plaintiff did or did not do, but also by the conjoining facts pertaining to what in the way of legal duty the plaintiff had a right to expect of the defendant.  Here, there being no light inside the door and the defendant being causally negligent in failing to provide such light before opening the theater, it is altogether possible that a group of reasonable men might fairly conclude that the combination of dangerous-when-dark construction within close proximity to the door and the absence of light made up the proximate and hence actionable cause of plaintiff's injuries.

*Second: Was the verdict excessive?*

Plaintiff's lasting injuries consisted of a cut immediately below the left knee, resulting in a linear scar 3-1/2 inches in length, and a partial loss of supination of the right hand and forearm resulting from fracture of the radius at the elbow.  Her physician's testimony was set to narrative by the trial judge in his opinion denying defendant's motion for new trial.  Such testimony includes the following (direct examination) :

"I sewed the wound on the left knee and gave her some tetanus antitoxin to prevent lockjaw, a seconal injection and dressing on her knee, and instructed her to come back for X-rays of the arm, when we found a broken radius at the elbow, and a cast was put on, and this was treated by immobilization in a cast, which cast was on, with splints, for about 4 weeks. After the splints were removed Mrs. Normand had difficulty flexing the arm and turning it outwards for approximately, I would say, 2 months —relatively large inability to do so—but this gradually improved. To turn it over is called supination. I saw her about once a week those early 4 months after the injury. During visits to my office she gave me complaints of pain and suffering, aside from the elbow which I have discussed, she had pain in her knees, because she had bumped her knees, or had the injuries I have already mentioned to you. I saw her last on April 24th of this year. On April 5th of this year she complained of a swelling and pain in both knees, with emphasis on the left knee, and the swelling was observable by me. She stated that upon standing and when she stood on the knee she had a burning pain in the knee, and upon getting up from her nightly rest her knees were stiff. I wouldn't say Mrs. Normand has complete 100% supination in the arm that was injured, but very close to it. With that kind of an injury at the elbow joint it is difficult to achieve 100%. I think elbow injuries are notorious for the fact that there isn't complete recovery. Assuming Mrs. Normand does not have complete supination, as I have said, then I believe the disability will be permanent. Mrs. Normand weighs approximately 150 pounds. She may suffer pain and discomfort in one or both knees in the future. I would say she may have pain in the future. And it might be for the rest of her natural life."

There is some doubt (see *In re Boyer's Estate,* 282 Mich 552) whether the noted loss of supination, and the testified knee injuries, are of permanent nature.

As to the scar, it of course is permanent. It was exhibited to this jury of men and women. The jury was supplied with superior means of judging the nature and prominence thereof and its embarrassing effect, if any, on the plaintiff. Also, jury members should know as much as we do about the value of good knees in the doing of floor or deck work, and what it means to lose such use of the knees for an indefinite period following injury thereto. Mrs. Normand testified to such loss, and continuity thereof to the time of trial, and defendant does not question such testimony.

Looking now to monetary appraisal of this verdict: $804.50 of the amount awarded is represented by expenses, leaving $9,195.50 attributable to past and prospective pain and suffering (see *O'Grady* v. *Rydman,* 347 Mich 606), past and prospective disability, and effect (if any) of the scar. It is said that this is too much, shockingly so. We find it appropriate in the way of answer to say that the jury was entitled to take into account the reduced value of today's dollar in making its criticized assessment, and that what might in the past have been excessive is not on the same facts necessarily exorbitant today. Judged in such light, we cannot say that this verdict is excessive.

On the very day of this writing (July 15, 1957), the Detroit Free Press observed editorially something this Court may and should judicially notice: "and the pace of inflation has been stepped up from a crawl to a trot." In 1950 the editorial writers of American Law Reports prepared an exhaustive brief entitled "Changes in cost of living or in purchasing power of money as affecting damages for personal injuries or death" (12 ALR2d 611). (They might well prepare another, bringing 1950 into comparative array with the Free Press' characterization of 1957.) In such annotation it is shown that the courts

of this country are generally agreed that judicial review of verdicts in personal injury cases should take into account the fact that a change has taken place in the purchasing power of money, and in the cost of living, which of right may be reflected in damage awards; further, that such economic developments are so much a matter of common knowledge that judges and juries are entitled to consider them although not expressly proven in evidence (Compare *Palmer* v. *Security Trust Co.*, 242 Mich 163 [60 ALR 1392] with *Graham* v. *United Trucking Service, Inc.*, 327 Mich 694, 706).

The appalling effects of this trend are not peculiar or limited to urban and metropolitan centers. The disease of devalued money spreads to all lands and all peoples, and we must assume that folk resident of Michigan's far away copper country, "way up there where the moon changes,"* know its burdens just as we do, here in our downstate quarters. This Houghton county jury came to conclusion that $9,200 was a fair appraisal of Mrs. Normand's unliquidated damages. It is fair to infer that the members did so according to their appraisal of the value of the dollar amount they reported. This was quite proper and, unless we are prepared to say—I think we are not—that a damage verdict of $4,500 to $5,000, rendered any time before or during the last world war on corresponding proof, would then have been held excessive, this one assuredly cannot be pronounced a shock to whatever conscience an appellate court, sitting at law, is supposed to have.

We find no error. Judgment affirmed, with costs to plaintiff.

DETHMERS, C. J., and SHARPE, SMITH, EDWARDS, VOELKER, KELLY, and CARR, JJ., concurred.

---

* From "The Blazed Trail", by Stewart Edward White (McClure, Phillips & Co., 1902 ed), chap 27, p 246.