Joe GRANT and Cenella Grant,
Plaintiffs,

v.

NATIONAL ACME COMPANY, a division of Acme-Cleveland Corporation,
Defendant.

Civ. A. No. 6107.

United States District Court,
W. D. Michigan, S. D.

Dec. 12, 1972.

Marcus, McCroskey, Libner, Reamon & Williams, Muskegon, Mich., Robert J. VanLeuven, Muskegon, Mich., of counsel, for plaintiffs.

Cholette, Perkins & Buchanan, William D. Buchanan, Grand Rapids, Mich., for defendant.

## OPINION AND ORDER

FOX, District Judge.

This is an action for recovery of damages for personal injury, founded upon the court's diversity jurisdiction. At the time of injury, plaintiff Joe Grant was employed by Lakey Foundry Company as an operator of an edge blow core machine manufactured by defendant Demmler Manufacturing Company, presently a subsidiary of National Acme Company. Cenella Grant is a named party plaintiff, but her claims have been withdrawn.

Following a jury trial on plaintiff's allegations of negligence and breach of implied warranty, a verdict was returned in favor of plaintiff in the amount of $187,750. At trial, defendant's motion for directed verdict was denied. Presently before the court is defendant's motion for judgment notwithstanding the verdict or for new trial.

The edge blow core machine operated by plaintiff was designed and used for making sand cores. During a normal cycle of this machine, sand would be forced by air pressure into a closed steel mold and compressed for several seconds at extreme temperature and pressure. Thereafter, the jaws of the mold would reopen. The machine was connected by cables to a control panel and an operator's console. In order to operate the machine, it was necessary for an operator to stand at the operator's console located several feet from the machine, to depress two palm buttons simultaneously, and to hold the buttons down until

the cycle was completed. Upon the completion of the cycle, the operator was then required to walk from the operator's console to the machine, remove the sand core and then again reach inside the machine to clean it of any residual sand particles. This cleaning task inherently involved on frequent occasion prolonged exposure of the operator's hands and arms inside the jaws of the mold.

On November 18, 1969, plaintiff was operating the edge blow core machine, and while he was cleaning it (and while neither palm button was depressed), the machine suddenly and unexpectedly cycled, crushing and burning his right arm. The extent of injury to the arm was so severe that amputation was necessary.

All parties agree that this abnormal cycling was prompted when the wires inside the cable connecting the operator's console and control panel to the machine fused and thereby caused a short circuit in the electrical system of the machine. This short circuit, in turn, permitted electrical energy to bypass the palm buttons and actuate the machine cycle. The cable containing the electrical wiring had been located beneath the floor by electricians of Lakey Foundry, according to the Lakey electrical foreman who installed the machine, William J. Puisis, in order to protect the cable from heavy equipment and traffic over the floor. As a result of this installation, the cable was in position across the ceiling of the basement below. On the day of plaintiff's injury, someone apparently moved a portable heater or salamander near where the control cable was located and thereafter, in an effort to generate more heat, removed a cover plate on the top of the salamander, exposing an open flame. This flame suddenly shot to the ceiling, burning the control cable and fusing the wiring therein.

Plaintiff's claim, sounding in both negligence and implied warranty, is that the defendant manufacturer of this edge blow core machine failed to meet its duty to make this potentially dangerous machine reasonably safe for its foreseeable intended use. Before proceeding to examine the ultimate question of whether plaintiff succeeded in raising sufficient facts to take his claim to the jury, some initial consideration of the legal nature of that claim may be appropriate.

■■ The substantive law of Michigan is applicable in this case. Whether couched in terms of negligence or implied warranty, a manufacturer does have a duty to exercise due care in safeguarding its product against reasonably foreseeable risks to persons using that product in the manner intended and reasonably foreseeable. The common law duty of reasonable care in this respect is expressed in the Restatement of the Law of Torts 2d, Section 398:

"A manufacturer of a chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the chattel or to be endangered by its probable use for physical harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design."

It is clear that this duty of a manufacturer is recognized in Michigan. See Farr v. Wheeler Manufacturing Co., 24 Mich.App. 379, 180 N.W.2d 311 (1970). Not only have Michigan courts adopted Section 398, but also, in the absence of specific state authority, the Sixth Circuit Court of Appeals has recognized and applied it. Gossett v. Chrysler Corp., 359 F.2d 84 (1966).

■■ Michigan law also clearly provides that a manufacturer has a responsibility to make his products reasonably fit for their intended use. This implied warranty principle is applicable in Michigan without regard to privity of contract limitations. Spence v. Three Rivers Builders & Masonry Supply, Inc., 353 Mich. 120, 90 N.W.2d 873 (1958). The implied warranty concept relative to

safety devices has been succinctly expressed as follows:

> "(W)here there is an unreasonable risk of harm to the user of a machine which has no protective safety device, as here, the jury may infer that the machine was defective in design unless it finds that the incorporation by the manufacturer of a safety device would render the machine unuseable for its intended purposes." Bexiga v. Havir Manufacturing Corp., 60 N.J. 402, 290 A.2d 281, 285 (1972).

Since a machine cannot be deemed reasonably fit for its intended use if it poses unreasonable dangers to its users, the implied warranty of fitness encompasses a warranty that the machine is sufficiently guarded to be reasonably safe in its intended operation.

■■ The manufacturer's duty in respect to the implied warranty of fitness, therefore, quite closely resembles the broad common law duty to exercise reasonable care in the design and construction of products. The fact of this resemblance in the area of safe design, however, does not serve and should not serve to minimize or discredit the legitimacy of either cause of action. Although plaintiffs frequently plead both negligence and breach of implied warranty when asserting inadequate safeguarding, Michigan courts generally address motions for directed verdicts without distinguishing between the theories, by simply identifying the manufacturer's duty in this area. Farr v. Wheeler Manufacturing Co., supra; Byrnes v. Economic Machinery Co., 41 Mich.App. 192, 200 N.W.2d 104 (1972); Jennings v. Tamaker Corp., Mich.App.1972, 201 N.W.2d 654. "The rule for design liability" adopted in Michigan is that quoted with approval in Farr v. Wheeler Manufacturing Co., supra, from Gossett v. Chrysler, supra, 359 F.2d at page 87:

> "It is the duty of a manufacturer to use reasonable care under the circumstances to so design his product as to make it not accident or foolproof, but safe for the use for which it is intend-

ed. This duty includes a duty to design the product so that it will fairly meet any emergency of use which can reasonably be anticipated."

As the Michigan Court of Appeals elaborated in Farr:

> "The fundamental standard imposed on a manufacturer is to be reasonable and prudent under all circumstances. In the area of product design, he must use reasonable and ordinary care under the circumstances in planning or designing his product so that it is reasonably safe for the purposes for which it is intended." 180 N.W.2d at 315.

In this case, therefore, whether the edge blow core machine was defective because unreasonably unsafe is no less an issue than whether it was negligently designed. Both are questions properly put in issue by plaintiff, subject to plaintiff's proofs.

Moving to a consideration of the sufficiency of plaintiff's proofs in this case, this court finds that plaintiff did succeed in creating factual issues for the jury. Both sides agreed that in the event of a short circuit anywhere in the electrical system controlling the machine's cycle, the machine would close and greatly endanger its operator. The fact was also undisputed that no safety device protected the operator against this danger. While acting as an entirely blameless operator of this machine, plaintiff was injured when a short occurred, causing the machine to close on his arm. Plaintiff further introduced at trial the testimony of two qualified electrical engineering expert witnesses, Herbert A. Strum and Dr. Charles C. Hoopes, who testified (1) that electrical short circuiting is quite common and foreseeable in industry, (2) that the practice in the electrical engineering profession has been to design protective mechanisms in anticipation of accidental shorting or other electrical failures, (3) that several alternative mechanical, neumatic and hydraulic guards could have safeguarded this machine against the

dangers of short circuiting to the operator at nominal cost and without interference with the machine's intended function, and (4) that such guards were generally known in the industry for more than ten years before the date of this machine's manufacture. Among the specific suggestions made by Mr. Strum were: a self-supervising control wiring system which would automatically cut off power in the event of a sudden surge of power, a system of mechanical interlocks controlling a separate and independent circuit around the machine such that the machine could not cycle while this outer circuit were broken (e. g. by an open gate), a foot operated independent air pressure control. Dr. Hoopes also mentioned the possibility of a neumatic valve control, although he favored a gate-operated simple mechanical interlock. Such a device, he testified, is well known in the industry and in common use, having been the subject of discussion before the National Safety Council in 1957.

In light of this evidence, uncontradicted as to the economic or technological feasibility of the suggested guarding devices, this court has ruled at trial and again finds that plaintiff has successfully established a jury question as to whether the Demmler edge blow core machine involved in this case was defective in design because unreasonably dangerous for its intended use. The jury returned a verdict for plaintiff.

In support of its motion for judgment notwithstanding the jury verdict in this case, defendant cites extensive authority for the proposition that it cannot be held responsible as an insurer or for consequences curable only with the aid of hindsight. The principal Michigan authority on this quite valid point is Fisher v. Johnson Milk Co., 383 Mich. 158, 174 N.W.2d 752 (1969). In that case, plaintiff slipped and fell on snowy pavement while carrying milk bottles in a wire carrier. He cut his hand falling into the bottles which broke as he fell. The court directed a verdict for defendant on the grounds that a manufacturer is not an insurer, that his products need not be accident-proof, and that any danger inherent in the design of the carrier was open and obvious. It is true, as the court noted in Gossett v. Chrysler Corp., supra, 359 F.2d at page 87, that "(t)he manufacturer is not an insurer that his product is, from a design viewpoint, incapable of producing injury."

Given that a manufacturer need not produce a foolproof, or even safer, product, however, the fundamental question in this case still remains whether this court should find as a matter of law that reasonable men could not disagree about the conclusion that this machine was reasonably designed to protect its user against reasonably foreseeable risks of harm. The evidence in this case does not support such a finding.

The edge blow core machine did not pose an obvious danger of shorting. *If anything, the presence of the palm buttons prompted a false sense of security in the operator that the machine would not cycle unless they were depressed.* To quote again the Sixth Circuit Court of Appeals ruling in Gossett, supra, the manufacturer's duty "includes a duty to design the product so that it will fairly meet any emergency of use which can reasonably be anticipated." Short circuiting is an emergency of use which experts testified was reasonably foreseeable by the manufacturer.

"Reasonable foreseeability of harm is the very prototype of the question a jury must pass upon in particularizing the standard of conduct in the case before it." Harper & James on Torts, Section 18.8, pp. 1058, 1059, quoted with approval in Bonin v. Gralewicz, 378 Mich. 521, 527, 146 N.W.2d 647, 650 (1966).

Whether the risk of short circuiting was reasonably foreseeable and unreasonably dangerous to users of this machine was a question for the jury in this case.

Defendant further asserts that a manufacturer is not responsible for injuries resulting from misuse of its products. One need go no farther than the

formulation of the warranty of fitness to find that the manufacturer is bound only to design its product to be "fit for its intended use." If a machine is used for a purpose or in a manner other than the manufacturer intends or can reasonably foresee in conjunction with the intended use, no warranty applies and no duty of care exists.

Defendant argues that the issue of misuse is raised and conclusively shown in this case. The concept of misuse, properly viewed, however, is wholly inapplicable here. Plaintiff was undisputedly operating the machine properly, carefully and completely as intended. When the accident happened, the machine was being used to make sand cores, as intended. The accident was in no sense the result of any effort to perform some function beyond that intended. Consequently, any argument of misuse in this case misapplies that principle. The flame which shot from the basement salamander was a circumstantial development quite unrelated to the method by which the core machine was being used. Lakey Foundry was not in any way employing a flame in order to implement some kind of misconceived improper use of the machine.

■ Someone's negligence apparently caused the salamander to momentarily surge out of control and trigger a short circuit in the core machine. This development does not lay grounds even for a jury argument on the subject of "misuse." Rather, it raises possible questions of foreseeability, breach of duty, and proximate cause. Foreseeability was a jury question, for reasons indicated above. Both foreseeability and intervening cause were ably and ardently argued and carefully submitted to the jury for its consideration. Defendant's duty was thoroughly explained as above. To say that the burst of flame was evidence of misuse, however, would be to unreasonably emasculate the clear duty of a manufacturer to protect against reasonably foreseeable risks of harm to users of its products. Properly construed, the salamander flame was an environmental circumstance of a kind which the jury could, and did, find to be reasonably foreseeable in occurrence and consequence.

■ Finally, defendant persists in the argument that it is entitled to judgment in this case because of the fact that Lakey Foundry substituted its own wiring conduit for that provided with the machine. Testimony at trial not only raised a jury issue on this point but, in fact, conclusively established that the conduit installed by Lakey was of the same standard and quality as that originally provided. The substitution was only made to permit a longer cable link between the machine and the control panel so as to facilitate installation. Expert testimony as well as the testimony of Lakey electricians established that as a result of this minor modification, no compromise whatever was effected in the heat resistant quality of the cable. No defense evidence even rebutted this point.

In light of the foregoing, the court accordingly finds that defendant's motion for judgment notwithstanding the jury verdict must be and the same is hereby denied.

Defendant further moves, alternatively, for new trial on the basis of numerous assertions of error in the court's instructions to the jury. Many of the issues so raised are controlled by the discussion above and will not be considered further.

Defendant argues, first, that the court should have given the following requested instruction:

"The defendant manufacturer is not liable as an insurer, and he is under no obligation or duty to make the product accident-proof or foolproof."

While this precise language was not used by the court, the court did include in its discussion of a manufacturer's duty a clear and unequivocal instruction that "the manufacturer is not an insurer that his product is, from a design viewpoint, incapable of producing injury

or is foolproof." The court further charged the jury that: "A manufacturer need not protect the machine it makes from unforeseeable extraordinary circumstances;" and "Merely proving that an injury would not have occurred had a particular product been differently designed does not necessarily establish a breach of duty as to design." In light of these instructions and the instructions as a whole, the court finds that the jury was adequately advised of the limitations of defendant's legal obligations.

Defendant objects to the court's charge that "this duty includes a duty to design the product so that it will fairly meet any emergency of use which can be reasonably anticipated." This charge follows directly from language previously quoted herein from Gossett v. Chrysler Corp., supra. The jury was repeatedly instructed that warranty liability extends only to purposes and uses intended by the manufacturer. The charge at issue, therefore, merely served to properly refine that basic concept along lines first expressed by the Sixth Circuit Court of Appeals.

Defendant cites, without elaboration, some eighteen of its requests to charge as proper statements of applicable law which were erroneously omitted from the court's instructions. Without indulging in lengthy analysis of each request and specific points of the charge which related thereto, the court finds that the jury was thoroughly and fairly advised of all elements of liability and damages and that differences between the cited requests and language actually employed by the court primarily reflected considerations of clarity of expression rather than significant substantive inconsistency. Many of the cited requests were, in fact, included in the court's charge in very substantially the form requested.

Defendant urges, specifically, that the court erred in failing to give the following instruction:

"Foresight, not retrospect, is the standard of diligence. It is nearly always easy, after an accident has happened, to see how it could have been avoided. But negligence is not a matter to be judged after the occurrence."

Here again, while the court did not employ the specific language requested, the substance of the request was amply communicated to the jury. Portions of the charge already quoted above indicate that the jury was clearly informed that a simple demonstration of how, from hindsight, a given accident could have been avoided is insufficient to establish liability.

"Merely proving that an injury would not have occurred had a particular product been differently designed does not necessarily establish a breach of duty . . . ." (Tr. p. 15–A.)

Defendant also specifically objects to the court's refusal to instruct the jury as to the tax consequences of any damage award. The law is clear that such an instruction is within the trial court's discretion. Indeed, the majority view apparently favors withholding all reference to income tax consequences. Prudential Insurance Co. of America v. Wilkerson, 327 F.2d 997 (5th Cir. 1964); Nice v. C & O RR., 305 F.Supp. 1167 (W.D.Mich.1969); McWeeney v. N.Y., N.H. & H. RR., 282 F.2d 34 (2nd Cir. 1960). See 63 A.L.R.2d 1393, § 4(a).

Defendant objects that the court "failed to instruct the jury on the preponderance of the evidence." This is incorrect. At the beginning of the trial, the court gave an extended instruction defining and discussing the concept of preponderance of evidence as it relates to plaintiff's burden of proof as to all material elements of the case.

"The burden is upon the plaintiff in a civil action such as this to prove every essential element of his case by a preponderance of the evidence. If the plaintiff should fail to establish any essential element of his claim by a preponderance of the evidence, then you should find for the defendant. To establish by a preponderance of

the evidence means to prove that something is more likely than not. In other words, a preponderance of the evidence means such evidence as when considered and compared with that opposed to it, has more convincing force and produces in the mind the belief that what is sought to be proved is more likely true than not true. In determining whether any fact in issue has been proved by a preponderance of the evidence, you should consider the testimony of all witnesses regardless of who may have called them, and all exhibits in evidence regardless of who may have produced them. The law does not require a demonstration of that degree of proof which excludes all possibility of error or produces absolute certainty, for such degree of proof is rarely possible. It is proper to find that a party has succeeded in carrying its burden of proof of an issue of fact if the evidence favoring one side of the question is more convincing than that tending to support the contrary side; and it causes you to believe on that issue, the probability of truth favors that party."

At the close of proofs, the jury was reminded of all earlier instructions before and during the trial as being "controlling in this case at this time and all through your deliberations." In light of this extensive instruction, the court cannot understand the basis for defendant's objection. This appears to the court to be further indicative of a shotgun type approach to the motion before the court. Such an approach merely obscures substantive areas of controversy and unnecessarily burdens the court's valuable time.

Defendant's objections to the charge as given include several references to the "misuse" defense. For reasons detailed above, the court finds that defense essentially inapplicable in this case. The jury was repeatedly charged that defendant's duty extended only to intended and reasonably foreseeable uses and not to extraordinary or unusual uses.

Defendant notes that on some occasions the court used the term "foreseeable" without the adjectival limitation of "reasonably." The court's instruction on foreseeability carefully and properly set forth the standard of reasonable foreseeability. While discussing other elements of the case, looser references may have suffered the technical imprecision defendant notes, but the court is confident that no party was materially prejudiced thereby. In a charge of this kind, a very precise instruction on liability would require use of the term "reasonable" several times in every sentence (e. g., at issue is what a reasonable man, exercising reasonable care will reasonably foresee as a reasonable use, reasonably intended). Such an exhaustive indulgence in precision would surely serve merely to obfuscate the issues. Without belaboring more specifics, the court finds that many of defendant's other objections to the wording of the charge as given raise petty points of nuance and interpretation which, even if well founded, plainly lack material significance.

▮▮ At trial, the court gave the following instruction:

"Defendant is required by law to give adequate warning of dangers likely to attend the reasonably foreseeable use of its product."

Defendant contends that failure to warn was in no way relevant to this case. The charge as given is a correct and accurate statement of the law. It could not have been prejudicial. It was appropriate in light of plaintiff's proofs indicating that no oral or written communication from defendant advised of the limitations of the effectiveness of the palm buttons or the vulnerability of the core machine to short circuit mishap. If short circuiting did pose a reasonably foreseeable danger, plaintiff's proofs laid sufficient foundation for a finding

that defendant should have warned users of the machine of the danger of spontaneous recycling and the importance of shielding the control wiring cable from external hazards.

■ Defendant next objects that portions of the court's charge had the effect of shifting the burden of proof by instructing the jury that the machine's defective condition could be inferred from circumstantial evidence. Much of the evidence in this case was circumstantial. The jury was accordingly informed that factual issues, such as defect, could be resolved by inference from such circumstantial evidence. This is surely an axiomatic proposition of law. Despite defendant's assertion that "there is just no reason to infer that the product was defective," a jury question was presented in this case on the subject of product defect. Inference from established fact was a fundamental tool available to the jury as it confronted that and all other factual questions.

Defendant takes exception to the court's charge:

"I might state here that there is no question about the quality of the cables, whether it was put in by Lakey or whether it was put in by the defendant company. There isn't any conflict between the parties, actually, from the evidence that is in the case on the quality of the products in this respect."

Defendant asserts that:

"There was no evidence in this case that the quality of the cable provided by Lakey was as good as the cable provided by the defendant. Nor did the defendant ever stipulate or agree to this fact. It may very well be that the Lakey cable may have melted sooner and shorted sooner than the defendant cable."

This argument by defendant very simply misrepresents the record. As mentioned earlier, plaintiff's electrical engineering experts as well as the chief electrician for Lakey testified that the cable used by Lakey was indistinguishable from that supplied by defendant in terms of strength, durability, flexibility and heat resistance. Demmler officials could not refute this testimony. Consequently, the relative quality of the two conduits was not in issue in this case.

■ Defendant further takes exception to the following excerpt from the court's charge:

"However, in Michigan it is the rule that once you have decided that they are—that plaintiff is entitled to recover damages, then in your computation of damages, any risk of uncertainty should be thrown upon the wrongdoer instead of upon the injured party. It has been determined by our courts that it is better to run a slight risk of giving somewhat more than actual compensation than to cast any part of the loss upon the injured party, even though the precise amounts cannot be ascertained by fixed rules but must be a matter of opinion and probable estimate."[1]

This charge accurately states Michigan law. It was given in the midst of the court's general charge that plaintiff has the burden of proof as to each element of damage. In this context, the challenged instruction explains that once plaintiff has demonstrated an element of damage by a preponderance of evidence, the formulation of the exact amount of compensation should resolve uncertainty in favor of plaintiff. That this is the law in Michigan is beyond dispute. See Allison v. Chandler, 11 Mich. 542, 554 (1863); Gilbert v. Kennedy, 22 Mich. 117, 131 (1871). See also: Story Parchment v. Paterson Parchment, 282 U.S.

---

1. The challenged instruction was preceded by:
"Now before considering the question of damages, you must determine the question of liability. If you find from the evidence and the instructions that the defendants are liable to the plaintiff, then, and only then, are you to consider damages." (Tr. p. 21A, July 20, 1972).

555, 563, 51 S.Ct. 248, 75 L.Ed. 544 (1931); Routsaw v. McClain, 365 Mich. 167, 112 N.W.2d 123 (1961); Muskegon Agency v. General Telephone Co., 350 Mich. 41, 85 N.W.2d 170 (1957).

As further grounds in support of its motion for new trial, defendant urges the impropriety of the court's instruction that the jury could, in determining damages, consider the reduced value of today's dollar and the fact that "changes take place in the purchasing power of money and the cost of living." This charge also has firm roots in Michigan law. Normand v. Thomas Theatre Corp., 349 Mich. 50, 61–62, 84 N.W.2d 451 (1957). See also: Willmore v. Hertz Corp., 437 F.2d 357 (6th Cir. 1971).

Also challenged as irrelevant and prejudicial is the following instruction:

"Mass production and complex marketing conditions have resulted in the emergence of the implied warranty doctrine to protect users of the products. Liability for damages resulting from dangerous or defective products attaches to the manufacturer without regard to the concepts of negligence or contributory negligence. Concepts of negligence have no place in the implied warranty doctrine. The cost of the damages for defective or unsafe products is thereby imposed on the manufacturer of the product who has the opportunity to avoid causing injuries by design and by manufacturing and by inspection and by foresight. The law imposes a duty on manufacturers of products to manufacture and design products which are reasonably safe for foreseeable use."

This instruction is neither misleading nor inaccurate. See: Piercefield v. Remington Arms, 375 Mich. 85, 133 N.W. 2d 129, 134 (1965), and McCormack v. Hankscraft Co., 278 Minn. 322, 154 N. W.2d 488, 500 (1967). It was employed to assist the jury in gaining an understanding of the purpose and meaning of the implied warranty doctrine in the context of everyday life. Since the law of implied warranty is generally both novel and complex to lay jurors, such an introduction is useful. This court finds nothing prejudicial for either party in such an instruction. It is balanced in presenting both the basis and the limitations of liability. Defendant cites no specific ground of prejudice except that assertedly arising from the court's unmodified use of the word "dangerous." Once again, the demand is made that "unreasonably" precede the noun in question. Any possibility that the jury was misled on this point, however, is erased by the court's immediately subsequent unequivocal statement of a manufacturer's duty "to manufacture and design products which are *reasonably* safe for foreseeable use." (Emphasis supplied.) This fundamental principle was frequently and clearly reiterated throughout the jury charge in this case.

In light of the facts that plaintiff was a young, strong and healthy man who permanently and completely lost his entire right arm as a direct result of the accident giving rise to this lawsuit, this court does not find the jury award of $187,750 excessive. Plaintiff's proofs on lost wages alone could support such compensation.

Defendant asserts that the verdict in this case was against the great weight of the evidence, the plaintiff failing to introduce any evidence with respect to essential elements of his case. This court cannot accept this argument, for reasons already stated. Defendant again makes specific reference to foreseeability. As previously noted, experts did testify as to the foreseeability of electrical shorting, as well as to the feasibility of anticipatory safeguards. Although defendant has persisted in the attempt to narrow the foreseeability issue to whether it could reasonably foresee the specific accident in this case, such view is untenable.

To establish his case, plaintiff was required to demonstrate a reasonably foreseeable hazard which defendant could have feasibly anticipated and

guarded against and which proximately caused plaintiff injury. This plaintiff successfully, and apparently convincingly, accomplished. Plaintiff demonstrated the substantial foreseeability of a substantial risk of electrical short circuiting in defendant's machine. He further demonstrated that in the event of short circuiting, a significant immediate danger was posed to users of that machine. The risk thus established, at least on a prima facie basis, defined the parameters of defendant's duty. Evidence indicating that defendant failed to guard against this risk, despite the availability of feasible guarding designs, created a jury question as to whether defendant breached its duty. In light of the evidence that plaintiff was injured while operating defendant's machine as intended and as a result of an electrical short circuiting, the jury had solid basis for its decision that defendant's breach of duty was a proximate cause of plaintiff's injury.

Finally, defendant asserts that the testimony of electrical engineering experts Herbert Strum and Charles Hoopes was inadmissible. This evidence was not only admissible but highly relevant and significant for plaintiff's case. Defendant cites the principle that a manufacturer need not make his product "more safe" so long as it is reasonably safe. To bar all of plaintiff's expert testimony on this ground would be as erroneous as the cited principle is valid. These experts could not have testified merely as to how the edge blow core machine might have been more safe, but they could and did testify as to whether the machine as designed was reasonably safe in light of reasonably foreseeable hazards and feasible, reasonably available alternative designs. The credentials of Mr. Strum and Dr. Hoopes were not challenged. Their opinions on the indicated subjects were admissible.

For all of the reasons indicated above, defendant's motion for judgment notwithstanding the verdict or for new trial is hereby denied.

It is so ordered.