ANDREWS v INSURANCE COMPANY OF NORTH AMERICA

1. TORTS—NEGLIGENCE—WORKMEN'S COMPENSATION—INSURANCE CAR-
   RIER—STATUTES.

   A workmen's compensation carrier is not immune from common-
   law tort liability for its own acts of negligence resulting in
   injury to employees where the negligent acts occurred prior to
   the effective date of an amendment to the Workmen's Compen-
   sation Act which immunizes the carrier; tort liability is im-
   posed upon the carrier where the carrier has undertaken to
   furnish safety inspections, giving rise to a duty to use reasona-
   ble care, and the carrier fails to use reasonable care (MCLA
   418.131, 418.827).

2. NEGLIGENCE—WORKMEN'S COMPENSATION—INSURANCE CARRIER—
   SAFETY INSPECTIONS—DUTY OF REASONABLE CARE—JURY.

   The question whether the undertaking of a workmen's compensa-
   tion carrier to furnish safety inspections for an employer is
   sufficient to create a legal duty to use reasonable care is a
   question of fact for the jury; the jury is given wide latitude in
   evaluating the undertaking of an insurance carrier.

3. NEGLIGENCE—WORKMEN'S COMPENSATION—INSURANCE CARRIER—
   SAFE PLACE TO WORK—DUTY OF REASONABLE CARE.

   A workmen's compensation carrier which voluntarily and ac-
   tively undertakes to assist an employer in performing the
   employer's obligation to provide a safe place to work for his
   employees is held to a standard of reasonable care; the carrier
   need not have complete control in ordering changes to be made
   by the employer in order to have a duty to the employee;
   however, there must be some relinquishment of control by the
   employer and some power granted to the carrier to effectuate
   recommendations.

REFERENCES FOR POINTS IN HEADNOTES
[1] 58 Am Jur, Workmen's Compensation § 563.
[2–4, 6] 58 Am Jur, Workmen's Compensation §§ 201, 202; 48 Am Jur
   2d, Labor and Labor Relations § 1875 *et seq.*
[5] 57 Am Jur 2d, Negligence §§ 6–9.

4. NEGLIGENCE—WORKMEN'S COMPENSATION—INSURANCE CARRIER—
SAFE PLACE TO WORK—INSPECTIONS—RECOMMENDATIONS—DUTY
OF REASONABLE CARE.

A workmen's compensation carrier's attempts to provide a safe place to work for employees of a machine shop were sufficient to give rise to a duty to exercise reasonable care where the carrier made safety recommendations to the employer which were followed in all major instances, and the carrier made repeated inspections and contacted upper management personnel when compliance with recommendations was slow, even though the carrier had no direct authority to order changes.

5. NEGLIGENCE—JURY—JURY QUESTION—REASONABLE MEN.

A determination of negligence is for the jury when reasonable men may fairly differ upon the question of whether there was negligence; only in rare and unusual cases will the issue of negligence be taken from the jury.

6. NEGLIGENCE—WORKMEN'S COMPENSATION—INSURANCE CARRIER—
SAFETY INSPECTIONS—REASONABLE CARE—EVIDENCE.

A finding that a workmen's compensation carrier which had undertaken to make safety inspections and recommendations for an employer failed to use reasonable care in providing for the safety of the employees was proper where the evidence showed that the safety protections which were recommended by the carrier required specific safety instructions, specific safety instructions were not given, and no proper safety program was in existence.

Appeal from Wayne, George T. Martin, J. Submitted Division 1 March 5, 1975, at Detroit. (Docket No. 19290.) Decided April 7, 1975.

Complaint by Thomas Andrews, individually and as next friend of Mary Ann Andrews, a minor, against the Insurance Company of North America for damages for injuries received in an industrial accident. Judgment for plaintiff, but defendant was granted a new trial. Plaintiff appeals by leave granted, and defendant cross-appeals. Order granting new trial reversed, and judgment for plaintiff reinstated.

*Ripple & Chambers, P. C.,* for plaintiff.

*Harvey, Kruse & Westen, P. C.,* for defendant.

Before: ALLEN, P. J., and McGREGOR and M. F. CAVANAGH, JJ.

McGREGOR, J. Plaintiff Mary Ann Andrews (hereinafter, references to "plaintiff" will mean this plaintiff, as the claim of Thomas Andrews is derivative) began work for Zenith Industrial Corporation (hereinafter designated as "Zenith") in September, 1968. Zenith was a small machine shop operation, and plaintiff had never done this type of work previously. About 20 persons worked at the shop and job assignments were given to them by the foreman on an ad hoc basis, each morning. No safety instructions were ever given to the workers. On September 28, 1968, plaintiff was assigned to operate a large stamping press and was shown how to operate it. However, no instructions on safety in the operation of that machine were given to her. On the day in question, she was merely shown by the foreman how to use the buttons and how to handle the tongs with which she was to insert material into and remove material from, the press. Plaintiff was operating one side of the press while another girl was operating the press opposite her. Both girls had to press two buttons at the same time in order for the press to come down. After operating the press continuously for several hours, using tongs to feed material into, and extract material from, the press, plaintiff's thumb became "tired and sore" from the use of the tongs, and she asked her foreman if she could discontinue using the tongs. He answered that it was all right and plaintiff began using her hands to feed material into, and extract material from the press.

During the course of the operation of the press, the buttons on the press failed to function properly; when plaintiff told the foreman of this malfunction, he solved the problem by taping down one of the buttons on the side of the press operated by the other girl. Later in the day, the girls changed sides, and plaintiff worked on the side of the press where one button was taped down. Shortly after the girls changed sides, plaintiff apparently had her left hand on the button while her right hand was inside the point of operation of the press. The press stamped down on plaintiff's hand.

Plaintiff was taken to the hospital where an unsuccessful attempt was made to save her hand. Three weeks later, all but the ring and small fingers of her hand were amputated; she remained in the hospital for approximately three months.

At all pertinent times, the workmen's compensation insurance carrier for Zenith was the Insurance Company of North America (hereinafter designated INA). That insurance coverage started in 1965. INA has a safety department staffed by some six or seven persons, which department has a function of evaluating the safety of a prospective insured's operation, and also to "sell" an already-insured business on improving safety conditions. Two members of this department, Meissner and Keleher, testified as to an extensive background of training and practical experience in proper safety practices.

INA made inspections of the Zenith plant on September 1, 1965, October 28, 1965, March 22, 1966, September 22, 1966, November 18, 1966, and September 26, 1967. The first inspection was made prior to the time INA agreed to insure Zenith. The purpose of the inspection was to determine the level of safety risk in the Zenith plant. Although

the inspector found Zenith to be a "poor" risk, INA wrote the policy anyway. That poor-risk status resulted primarily from the fact that Zenith failed to provide the "point of operation" guards on all press punches. The report states, however, that the employer agreed to install cage guards within two weeks.

As was customary with INA, after each inspection of the Zenith plant, a letter was written to Zenith executives with findings and recommendations. On October 25, 1965, a letter was written to the Zenith president from the inspector, to "offer" a safety recommendation, specifically, the installation of cage guards. This letter, as did all subsequent letters, ended as follows: "In order that our files may be kept up to date, may we have a word from you when the above suggestion has been complied with." The inspector made a follow-up inspection on October 28, 1965, three days after the letter, and reported that the employer had "complied with" the previous recommendation and that barriers had been installed.

On March 22, 1966, an inspection by a different representative of INA disclosed the fact that the guards on the small punch presses had been removed. This inspector wrote a letter to a Zenith executive on March 24, 1966, recommending (1) two-hand operating buttons, and use of tongs to insert and remove materials, in lieu of physical barriers such as cage guards; (2) the use of accident investigation forms; and (3) pre-employment physical examinations. After another inspection on September 22, 1966, this inspector reported that the two-hand operating buttons were in the process of being installed. The report continued that pre-employment physical examinations were not yet in force, but that Zenith was "working on it".

In addition, inspection reports were reported not to be in use, but the inspector reported that "it is not felt that they are necessary at this time". The inspector agreed with the plant supervisor that such were not needed for a small plant. Overall, the inspector concluded that the "plant superintendent is very cooperative and has complied with our recommendations to date". Again, a letter was sent to the Zenith executive with the same ending phrase.

A new inspection of the plant was made by INA on November 18, 1966, with the conclusion that no progress had been made on the two recommendations above; while dual buttons were again recommended, the need for tongs was dropped. As to the attitude of the insured, the inspection report concluded that "insured keeps promising to comply with recommendations, but has not complied to date". A "poor" risk was assigned to Zenith, and the inspector reported that the "recommendations are not being resubmitted".

A final inspection was made on September 26, 1967, after which Meissner, head of INA's safety department, reported that no recommendations were pending except for pre-employment physicals "which insured has declined to comply with in part". Meissner testified that he was told by Zenith that they would not give pre-employment physical examinations at all. However, Meissner testified that he did not consider this to be a "main issue". Two more recommendations, to recharge fire extinguishers and to repair a propane cylinder on a fork lift, were followed at this date. Meissner concluded that no more inspections were to be made unless new circumstances warranted such. No further inspections were made before the accident with which this action is concerned.

Plaintiffs Mary Ann Andrews and Thomas Andrews sued the Insurance Company of North America for negligence. A jury trial in circuit court ensued, in which the jury returned a verdict in favor of plaintiff Mary Ann Andrews in the amount of $255,000. Defendant filed a motion for judgment notwithstanding the verdict, or a new trial; after a hearing on this motion, the trial judge granted defendant a new trial, but denied a judgment notwithstanding the verdict.

Leave to appeal was granted by this court.

The issue before this Court is whether there was sufficient evidence presented at trial for the jury to conclude that plaintiff's injuries were caused by defendant's negligence in failing to recommend a proper safety program for the premises of plaintiff's employer.

A workmen's compensation carrier is not immune from common-law tort liability for its own acts of negligence resulting in injury to employees. *Ray v Transamerica Insurance Co,* 10 Mich App 55; 158 NW2d 786 (1968). The Legislature amended the Workmen's Compensation Act to change that result, MCLA 418.131, 418.827; MSA 17.237(131), MSA 17.237(827); 1972 PA 285, effective October 30, 1972. However, that amendment has been held to apply prospectively only. *Ray v Transamerica Insurance Co,* 46 Mich App 647; 208 NW2d 610 (1973).

Tort liability is imposed upon the carrier if two things are found: (1) that defendant has undertaken to furnish safety inspections, giving rise to a duty to use reasonable care; and (2) that defendant failed to use reasonable care. *Ray v Transamerica Insurance Co,* 46 Mich App 647, *supra.* Reliance by either the plaintiff or her employer is *not* a factor. *Olkowski v Aetna Casualty & Surety Co,* 53 Mich

App 497; 220 NW2d 97 (1974), *aff'd,* 393 Mich 758 (1974). Since defendant is moving for judgment notwithstanding the verdict, the test is whether the evidence adduced at trial is sufficient to create jury questions on the appropriate legal issues. *Watson v Employers Insurance Company of Wausau,* 50 Mich App 597; 213 NW2d 765 (1973).

We first consider whether the insurance company has undertaken to furnish safety inspections sufficient to create a legal duty to the employee to use reasonable care in making those inspections. That question is one of fact for the jury. *Ray v Transamerica Insurance Co,* 46 Mich App 647, *supra.* It is clear that the workmen's compensation carrier must be shown to have taken some affirmative action in order to find a legal duty. The relationship of insurance carrier to employer does not, by itself, create any duties on the part of the insurance carrier.

The extent of participation required by the insurance carrier was explored in the second Ray decision, *supra:*

"This is not to say that a mere failure to suggest or recommend a safety change would impose a duty and liability. It would not. On the facts adduced, the jury must have found that defendant had voluntarily and *actively* undertaken to assist Chesley Industries in performing the obligation owed by every employer to his employees—to provide a safe place to work. Having undertaken the duty, defendant is held to a standard of due care." 46 Mich App 647, 654.

Significantly, that Court, in *Ray,* found the following actions to be sufficient to support a jury's determination that a duty existed:

"Defendant's 'insurance engineer', Mr. James McCarthy, visited the plant once while it was in Detroit

and several times after its relocation in Farmington. He testified that he was the 'eyes of the insurer', and that his job was to give guidance and education in safety matters. He recommended that the plaintiff's machine be equipped with 'dual micro control' safety switches so that plaintiff could not operate his machine without both hands removed from the vicinity of the cutting blade. The record indicates that this recommendation was discussed with a supervisory employee of Chesley. This recommendation was rejected by Chesley. McCarthy also asked that a wire guard be placed in front of the operating surfaces. It is not clear from the record whether this was an alternative suggestion; however, Chesley complied and fabricated the guard in the shop. *McCarthy stated that he at no time made representations that he or his company was taking over any safety engineering function.* He admitted having seen the plaintiff's machine on October 2, 1964, the Friday immediately before the accident. He had not noted then, nor had he ever been told, that the gear guard had been removed.

"Further testimony of Mr. McCarthy elicited other facts. Even if he had noticed the uncovered gear, he stated that he probably wouldn't have recommended that it be covered because it was highly unlikely that anyone would be working near it. *He had no authority to order unsafe machines shut down, and his recommendations were not uniformly followed in this plant or any other.* It was further established that the rate paid by the insured would not be changed by dangerous conditions and that safety conditions had nothing to do with the rate that was charged by the insurer for the policy.

\*   \*   \*

"It is clear to us that the jury found a duty existed on the part of the defendant, that duty extended to the plaintiff because the plaintiff was clearly within the orbit of risk created by the negligent performance of the duty undertaken. The record supports this finding of the jury." 46 Mich App 647, 651, 654. (Emphasis added.)

Under the existing circumstances, an insurance company need not have complete control in ordering changes to be made by the employer, in order to have a duty to the employee.

The jury is given wide latitude in evaluating the undertaking of the insurance company. The Court, in *Megge v Lumbermens Mutual Casualty Co,* 45 Mich App 119; 206 NW2d 245 (1973), stated:

"Whether Lumbermens became a gratuitous volunteer, and whether there was sufficient reliance, are questions of fact for the jury. The Snover plant manager testified that Lumbermens made inspections every 30 days or so, during which machinery was inspected, and that he relied on Lumbermens' safety recommendations. Lumbermens' regional director testified the inspections were made once or twice a year, and were only cursory plant inspections, not machine inspections. *The frequency of the inspections, their character, and Snover's reliance on them are factual issues for jury resolution."* 45 Mich App 119, 122. (Emphasis added.)

However, the only case where a directed verdict was held to be proper, *Watson v Employers Insurance Company of Wausau, supra,* illustrates that there must be some relinquishment of control by the employer. That case involved a situation where the insurance company's advice was quite clearly subject to review by the employer's own safety staff:

"Plaintiff's case consisted of defendant's safety consultant's uncontradicted testimony and certain excluded expert testimony, preserved on a separate record. Mr. Viening, the safety consultant, testified that he first visited Molloy Manufacturing on October 10, 1968. He observed a press where a workman had been killed in a September accident similar to the decedent's. On that occasion, he recommended that steel barrier guards be installed on all similar presses to prevent ejection of

projectiles. *Molloy's supervisory personnel rejected that proposal, opining that steel barrier guards might create safety hazards by obstructing vision. They indicated that their engineering department would look into development of a plastic barrier guard.* Mr. Viening's suggestions were later reduced to writing and communicated via his home office to the employer.

\* \* \*

"Assuming an undertaking by defendant, no evidence showed that defendant increased the risk of harm, undertook performance of the employer's obligation of providing its employees a safe place to work, or defendant's conduct induced reliance of the employer or employee on the insurer. Testimony shows, to the contrary, that the employer rejected the insurer's suggestions, neither relinquishing any control to the insurer, nor relying on defendant's recommendation.

"The instant case is factually distinct from *Ray,* \* \* \* [where] *an insurance engineer had regularly visited the employer who followed some recommendations while rejecting others."* 50 Mich App 597, 599, 601–602. (Emphasis added.)

In order to hold the insurance company liable, there must be *some* power granted to effectuate recommendations made, but there need not be *complete* authority in that area.

In the instant case, there was evidence that the employer followed some of the recommendations of the insurance carrier. The record indicates, in fact, that the employer followed all of the insurance carrier's major recommendations. Testimony indicates that those not followed either were dropped voluntarily by the insurance company when faced with the practicalities of implementation, or were of minor consequence. For example, Meissner, head of INA's safety department, testified that the employer had complied with implementation of all "major issues". In addition, all but one of the reports indicated that the employer was in general

very cooperative. That one report merely stated that the employer seemed to be dilatory, not that the employer was making his own judgment on what was needed.

The recommendations not followed were not major in nature. The employer never implemented accident reports, but the employer had convinced the insurance inspector that such was not necessary in such a small operation as at Zenith. The employer refused to give pre-employment physical examinations, but such were not considered to be a "major" issue by INA.

Inspections were followed by letters to the Zenith management, which letters all concluded with the request that "in order that our files may be kept up to date, may we have a word from you when the above suggestion has been complied with". Subsequent visits were made to the plant to insure that the suggested changes were made. No direct authority to order the changes existed, but on at least one occasion, the carrier did bypass the supervisory personnel in order to gain compliance.

There was substantial evidence that the carrier in this case attempted to insure a safe place to work for the employees of Zenith. Recommendations for safety were made; these were followed in all major instances, although several lesser recommendations were rejected. Where compliance with the recommendations was slow, repeated inspections and contact with upper management personnel was continued until compliance was made. Such efforts give rise to the duty to exercise reasonable care in providing for the safety of the employees of Zenith.

The second issue before us is whether there was sufficient evidence for the jury to find a failure on the part of INA to exercise reasonable care.

In negligence cases, rulings as a matter of law are not favored because the jury is particularly well adapted to application of the "reasonable man" standard. *Davis v Thornton,* 384 Mich 138; 180 NW2d 11 (1970). A useful statement of the application of the general rule concerning summary dispositions to negligence cases is found in *Normand v Thomas Theatre Corp,* 349 Mich 50; 84 NW2d 451 (1957):

"When a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence is ever considered as one of law for the court.

"And in such cases the court merely declares the evidence is insufficient in law because insufficient in fact. When, therefore, it is said that a given act does or does not constitute negligence in law, the statement means no more than that in the judgment of all reasonable men—not judges alone, for it concerns a fact, and not a question of law—it would be esteemed such. When it can be affirmed that all reasonable men would agree as to the quality of an act in respect of its being either negligent or prudent, the court may give effect to such consensus of opinion, and direct a verdict in accordance therewith." 349 Mich 50, 56.

In *Misiulis v Milbrand Maintenance Corp,* 52 Mich App 494; 218 NW2d 68 (1974), this Court has emphasized that only in the rare and unusual cases will the issue of negligence be taken from the jury.

This Court concludes that there was evidence that INA was negligent. Plaintiff's major claim was that the protection employed for safety, *i.e.,* double button starters and tongs, required specific

safety instructions to make sure that they were used properly. Failure to provide a safety program made this recommendation negligent, especially since passive restraints such as cage guards were also available. It seems that, if no safety program was in existence, it is within the province of the jury to determine whether such was negligence on the part of the insurer. It cannot be said, as a matter of law, that no such program was required.

Plaintiff testified that no actual safety instructions were ever given to her. This supports the jury finding that no proper safety program was in existence. Defendant testified that its employees were affirmatively told that such a program existed; however, such merely creates a jury question, for the jury can disbelieve that testimony. However, the testimony concerning such safety program is not compelling. Defendant claims its programs were presented; INA's safety department inferred a presentation of a safety program took place simply because no lack was ever mentioned in the written reports; in addition, the inspector who testified only assumed that the safety department head had talked with the employees about safety training, as the inspector talked with all employers about safety training. The only safety factors which were verified in writing were the fact of "zero" minors being employed at the factory; and that "allegedly experienced employees" was indicated in reply to a question concerning the experience of employees. Neither of these facts indicated that the employees were trained and educated as to particular safety devices.

We conclude that the jury verdict finding liability on the part of INA should be affirmed.

The jury verdict is reinstated and the granting of a new trial is reversed.